UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 18-CR-00696 |
| v. | |
| ASHRAF AL SAFOO, a/k/a Abu Al'-Abbas Al-Iraqi, a/k/a Abu Shanab, a/k/a Abbusi | Judge John Robert Blakey |
| Defendant. | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I.  **Introduction**

This bench trial commenced on May 27, 2025. At the end of the Government's case, Defendant made a Rule 29 motion. 6/4/25 Tr. 94:6–95:8. Closing arguments occurred on June 4, 2025, and by agreement, included the parties' arguments regarding Defendant's Rule 29 motion. 6/4/2025 Tr. 134:5–7. At the close of trial, the Court reserved ruling until June 27, 2025. The parties previously waived the opportunity to submit proposed findings of fact and conclusions of law and further waived the right to ask this Court to issue a written order containing its findings. 6/3/2025 Tr. 100:3–103:21.

Nevertheless, as the Court informed the parties at the June 27, 2025 hearing, even though the parties waived requesting a written order, the Court found that the complexity of the case, and the nuance required to address the elements of the Counts charged, required a written order. 6/27/2025 Tr. 4:3–24. While the Court provided a much-shortened, oral ruling from the bench at the June 27 hearing, it incorporated its findings and analysis from this Order into that proceeding and now provides that extended analysis in writing.[1]

---

[1] The Court also denied Defendant's Rule 29 motion with respect to all Counts. 6/27/25 Tr. 5:4–6:8. The Court reiterates, as already stated on the record, that the factual discussion below was incorporated "by reference" to "the degree it is relevant" to the Rule 29 ruling. 6/27/25 Tr. 6:6–8. Additionally, the Court notes again that Rule 29 incorporates a distinct standard from the standard applied to the verdict. When evaluating a Rule 29 motion, a defendant faces "a nearly insurmountable hurdle," (*U.S. v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013) (quotation omitted)) because the "inquiry does not require a court to ask itself whether *it* believes the evidence at the trial established guilt

1

## II.    Evidence at Trial

The Court first addresses the evidence produced at trial.

### a. Government's Case
### i. Dr. Matthew Levitt

The Government first called Dr. Matthew Levitt.  Dr. Levitt's education consists of a bachelor's degree in political science from Yeshiva University, a Master of Law and Diplomacy from Tufts University, and a PhD in international relations also from Tufts.  Dr. Levitt's PhD thesis centered on how terrorist acts undermine negotiation processes.  He also completed a fellowship at the Program on Negotiation at Harvard Law School.  5/27/25 Tr. 24:3–22.

At the time of his testimony, Dr. Levitt maintained employment at the Washington Institute for Near East Policy, a nonpartisan think tank in Washington D.C.  Dr. Levitt first started at the Washington Institute in 1997, then left to join the FBI as a counterterrorism analyst from 1998 to 2001.  5/27/25 Tr. 25:15–18.  Dr. Levitt then returned to the Washington Institute where he founded the organization's counterterrorism program.  5/27/25 Tr. 25:21–22.  In 2005, Dr. Levitt became the Deputy Assistant Secretary for Intelligence and Analysis in the Treasury Department.  This was a "dual-hatted" position which also placed him as deputy director of "one of the U.S. intelligence agencies" operating under the then brand-new Office of Director of National Intelligence.  5/27/25 Tr. 26:1–5.

In 2007, Dr. Levitt returned to the Washington Institute and continued his employment there through the time of his testimony, with two brief exceptions.  The first was a 2008 assignment as counterterrorism advisor to General James L. Jones, who served as an envoy trying to secure a peace agreement in Palestine at the time.  The second was a 2024 assignment where the Treasury Department asked him to perform an assessment of a partnership between the United States and the Gulf State governments to combat terrorist financing.  5/27/25 Tr. 26:8–22.

As of May 2025, Dr. Levitt served as the director of the counterterrorism and intelligence program and a senior fellow at the Washington Institute.  5/27/25 Tr.25:1–2.  Pursuant to this role, Dr. Levitt oversees the work of two other senior fellows in the counterterrorism and intelligence program in addition to publishing his own research.  5/27/25 Tr. 27:3–7.  Dr. Levitt himself has published several books, op-

---

beyond a reasonable doubt," but "instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979) (quotations omitted) (emphasis in original).  This standard heavily contrasts with the government's burden to prove a defendant's guilt beyond a reasonable doubt as applied to the verdict.  Thus, the Court's denial of Defendant's motion applies to all Counts, despite the Court's not guilty verdict on Count 12, explained further below.

eds, peer-reviewed journal articles, magazine-style articles, and policy briefs, all concerning Middle Eastern terrorist issues and terrorist groups, including ISIS. 5/27/25 Tr. 27:23–28:14. He also regularly attends and speaks at conferences on counterterrorism issues and sits on the boards of multiple think tanks around the world, including serving as a life member of the Council on Foreign Relations. 5/27/25 Tr. 31:2–19. Dr. Levitt also served as an adjunct professor at Georgetown Law where he taught a class on counterterrorism and has also taught several counterterrorism classes at the Johns Hopkins University School of Advanced International studies. 5/27/25 Tr. 29:20–31:1.

Dr. Levitt previously testified as an expert in approximately two dozen federal criminal trials and several other international courts relating to terrorism. 5/27/25 Tr. 32:2–7. He has also testified before Congress numerous times, including about the proliferation of ISIS propaganda in response to certain global events. 5/27/25 Tr. 32:20–33:1. Both the Sixth Circuit and the Supreme Court have favorably cited his work in judicial opinions. 5/27/25 Tr. 32:13–19.

At trial, Dr. Levitt provided extensive testimony regarding his research methodology. Dr. Levitt's bases all his academic work on unclassified research, conducted by reading a variety of academic articles, other publications, and court documents, along with engaging in both formal and informal interviews with other experts in the field, government officials, and investigators from around the world. 5/27/25 Tr. 33:6–34:23. Dr. Levitt's research relies on both primary and secondary source materials from a variety of sources, including online sources run by terrorist groups such as ISIS. 5/27/25 Tr. 35:20–37:6. Primary sources are defined as "material that is produced by a primary source," in this case materials produced by a terrorist group or a government. 5/27/25 Tr. 35:4–6. Secondary sources are materials produced by individuals "reporting on" the primary source materials. 5/27/25 Tr. 35:7–19. Dr. Levitt speaks English and therefore relies on translations for primary source materials that are published in Arabic or other languages, although certain terrorist groups "like ISIS" produce "a lot of material in English." 5/27/25 Tr. 36:12–13.

The Government offered Dr. Levitt as an expert witness under Rule 702 on Middle Eastern terrorist organizations, including ISIS. 5/27/2025 Tr. 37:19–21. The defense did not object. 5/27/2025 Tr. 37:24. The Court found Dr. Levitt met the requirements of Rule 702 and permitted him to testify as an expert. 5/27/2025 Tr. 37:25–38:1. Dr. Levitt credibly testified to the following background information concerning ISIS and its operations.

ISIS stands for Islamic State in Iraq and al-Sham, which means greater Syria. 5/27/25 Tr. 38:6–10. ISIS is also known as ISIL, IS, or Islamic State, but all of these names refer to the same organization. *Id.* ISIS was formally founded in 2014 when its leader, Abu Bakr al-Baghdadi, declared himself "caliph" in Mosul, Iraq at the Al-

Nuri Mosque. 5/27/25 Tr. 41:13–18; 5/27/25 Tr. 46:9–14. Although this event marked the "formal" beginning of ISIS, in reality, ISIS was just the "latest name" for "a group that existed before under multiple names, the most famous of which was Al-Qaeda in Iraq" and was founded by a terrorist named Abu Musab al Zarqawi. 5/27/25 Tr. 38:11–14; 5/27/25 Tr. 41:17–22. The propagators of ISIS split from Al-Qaeda because they wanted to "declare the reestablishment of the caliphate." 5/27/25 Tr. 38:17–39:5. The caliphate is a "mainstream" concept in the Muslim faith and refers to "a kind of worldwide Islamic government that represents all Muslims" led by a "political leader" termed a "caliph." 5/27/25 Tr. 45:5–20.

After this split, Al-Qaeda in Iraq became "The Islamic State." 5/27/25 Tr. 39:9–12. After using that name within Iraq, the group then began to use the name internationally. *Id.* ISIS also adopted a flag previously used by other groups bearing what is believed "by many to have been the seal of the Prophet Muhammad himself." 5/27/2025 Tr. 46:23–47:2. Thus, "by taking it on as their own," ISIS adopted "a very powerful symbol for all Muslims," communicating that ISIS stood as "the true inheritors of the flag of the stamp of the Prophet Muhammad." 5/27/25 Tr. 47:3–8.

Over the years, ISIS became known for perpetuating acts of extreme violence, filming these acts, and then making the videos public on the Internet and social media. 5/27/25 Tr. 39:14–17. ISIS disseminated these images and videos as "part of an organized media campaign" that had "three core components." 5/27/25 Tr. 39:18–19. These components were: (1) to propagate ISIS ideology; (2) to "defend the movement against the counter-narratives being put out by the west, United States, Europeans, other Arab governments;" and (3) to instill fear in the enemies of ISIS by both carrying out and publicizing acts of extreme violence. 5/27/25 Tr. 39:20–40:3. ISIS also engaged in militant "jihad." The term "jihad" means "struggle" in Arabic and bears "two very distinct meanings" within Islam. 5/27/25 Tr. 49:24–50:3. The first meaning refers to the "struggle with oneself" to become a better and more observant person and includes the Islamic concept of "zakat" or tithing. 5/27/25 Tr. 50:3–9. The other definition refers to "fighting the enemies of Islam" and can have "both a defensive connotation" to "defend Muslim lands," or an "offensive variation" of "taking the fight to the enemy." 5/27/25 Tr. 50:3–20. ISIS, of course, engaged in the latter form as it "carried out attacks around the world." 5/27/25 Tr. 50:21–23.

ISIS considered anyone who did not accept their version of Islam as an enemy. This included the following broad groups: (1) the "West," or ISIS termed "crusaders"; (2) non-Muslims, who ISIS termed "infidels"; (3) apostates, or people who denounced the Islamic faith, left the faith, or practiced what ISIS deemed an unacceptable form of the faith; (4) people ISIS considered "polytheists," who they referred to as "mushwakeen"; and (5), and "most of all," ISIS "considered Shia Muslims" as enemies of the organization. 5/27/25 Tr. 40:7–13; 5/27/25 Tr. 48:5–49:18.

4

As Dr. Levitt testified, the Islamic faith maintains two main sects, the Sunni and the Shia. 5/27/25 Tr. 40:13–14. The two sects maintain "very sharp theological historical disagreement" over the leadership claims of the "three caliphs following the prophet Muhammad," which the Shia sect rejected. 5/27/25 Tr.40:19–22. ISIS, being a Sunni organization, considered Shia Muslims "rejectionists" and "carried out extreme violence against the Shia." 5/27/25 Tr. 40:7–13.

Members of ISIS would swear "bayat," or an oath of allegiance to follow whatever the caliph "and, by extension, the caliphate," asked of them. 5/27/25 Tr. 45:23–46:3. Anyone who aligned themselves and pledged their support to the caliph was considered part of the caliphate. 5/27/25 Tr. 55:7–11. ISIS members also adopted a "one finger" gesture to signify their support or membership in ISIS—the "one finger" referring to Islam and ISIS's central tenant of monotheism. 5/27/25 Tr.47:17–19.

By 2015, ISIS established a physical caliphate through military expansion, conquering parts of Iraq and Syria and controlling large swaths of territory in the region. 5/27/25 Tr. 54:9–55:2. ISIS established provinces, termed "Wilayat," within the territory they controlled. 5/27/25 Tr. 55:12–17. ISIS would also "declare provinces in places they didn't control," but where they had "some people who pledged themselves to The Islamic State." 5/27/25 Tr. 55:12–20.

In late 2017 or early 2018, "an international coalition partnered with the government of Iraq in particular" to defeat ISIS. 5/27/25 Tr. 57:7–11. These efforts largely succeeded and as of 2025, ISIS no longer exercises control over territory in a "governing" sense, although some "pockets" of ISIS still exist "especially in Syria." 5/27/25 Tr. 56:20–25.

During the period where ISIS fully controlled territory, spanning from 2014 to around 2019 (5/27/25 Tr. 57:9–13), ISIS maintained an established bureaucracy led by the caliph. This structure incorporated several ministries (termed "Diwans") like those of established governments, including ministries of finance, military, and media. 5/27/25 Tr. 59:4–15. Each of ISIS's provinces maintained a similar "province-level" structure, led by a governor. 5/27/25 Tr. 59:12–19. Within ISIS territory "there was no civil society" or "independent NGOs operating;" ISIS paid the salaries of workers, provided for certain healthcare needs, and gave assistance to the "poorer people in the territory they controlled." 5/27/25 Tr. 59:23–60:5. ISIS generated revenue to provide these services through: (1) conquering resource rich territory, especially in terms of oil wells; (2) "taxing" or "extorting" the population and the limited foreigners within their territories; and (3) issuing calls for people to donate. 5/27/25 Tr. 60:8–61:11.

Focusing on the media "Diwan" or ministry, this component of ISIS bureaucracy maintained ISIS's numerous official media organizations. 5/27/25 Tr. 61:20–22. For example, ISIS maintained a news agency ("Amaq"), a newspaper ("Al-

5

Naba"), a radio station ("Bayan"), and "a whole host of others, including what they would call foundations or libraries," which were "official institutions" that would release "written products, video products," and sometimes "audio products." 5/27/25 Tr. 61:20–4. The national media "Diwan," also termed ISIS central media, was distinct from the provincial media "Diwans." These organizations existed for each province and took direction from ISIS central media. 5/27/25 Tr. 62:9–11.

ISIS central media "also sought, as their sole area of authority, to give instruction to the larger world of people" who "were following The Islamic State, saw themselves as members of the Islamic State, and were producing their own content. Dr. Levitt testified it was "very important" to ISIS central media to "get that material out" and because of this importance, ISIS central media made "it very clear" that "content to be disseminated" outside of ISIS territory "was their sole purview" and "authority." 5/27/25 Tr. 62:12–63:7. They also produced documents instructing others on content including being "very careful about the professionalism of their production" and instructed others that "raw footage was not to be used." 5/27/25 Tr. 67:7–12. As Dr. Levitt testified, ISIS even had "a discussion of a system of rewards and consequences for those who put out material that was good or wasn't good." 5/27/25 Tr. 67:12–14.

ISIS further emphasized the importance it placed on the media by referring to "people who created or participated in any level in the recording, editing, production, dissemination, publication of this material as, in their terms, a media Mujahedeen," meaning "someone who is fighting jihad by doing media." 5/27/25 Tr. 63:8–12. To ISIS, the media Mujahedeen was "no less important and, in terms of the enemy, no less dangerous than the actual fighter" because ISIS was "not just carrying out acts of terrorism" but rather was trying "to build a caliphate." 5/27/25 Tr. 63:13–23. Therefore, to spread their message that "every Muslim around the world" had "to play their part in this caliphate," ISIS needed to both propagate their ideology, encourage their supporters, and also defend their movement from enemies and detractors. 5/27/25 Tr. 64:7–12. Accordingly, ISIS described "the media person as the equivalent of a suicide bomber," in the sense "that what they did was as effective as an atomic bomb." 5/27/25 Tr. 77:18–20.

ISIS disseminated a wide variety of videos, infographics, and publications through the Internet, including on multiple social media platforms. 5/27/25 Tr. 72:23–24. This dissemination often occurred through "campaigns," or targeted media efforts to increase followers and listeners by focusing on a particular current event, such as an ISIS military operation. 5/27/25 Tr. 73:11–19. Campaigns would use specific, coordinated hashtags or infographics coalescing around a unified message, such as the campaign "hashtag breaking the walls," focused on ISIS attacks on prisons to free some of their fighters. 5/27/25 Tr. 73:20–74:14. ISIS would also center campaigns on other global events to increase the number of social media users

6

receiving ISIS content in their feed. One example of this technique included an ISIS campaign centered around the 2018 World Cup. 5/27/25 Tr. 74:19–24.

Often, one of ISIS central media's official organizations would produce a product and then other media organizations would amplify and republish the item to increase its exposure. 5/27/25 Tr. 72:25–73:6. This included both official and unofficial media organizations. Dr. Levitt testified that "official" ISIS media organizations were those run by ISIS itself through either the central media "Diwan" or one of the province-level "Diwans" and their respective media outlets. 5/27/25 Tr. 75:4–7. "Unofficial" media organizations, in contrast, consisted of "people around the world" who aligned themselves with ISIS, would "typically" pledge "that allegiance," and would both promote "the content produced by The Islamic State and often" create "their own content as well, using the same themes, the same type of production standards and processes called for by The Islamic State central media Diwan." 5/27/25 Tr. 75:9–14.

ISIS would publish material for both "its provincial media outlets and, more generally, for its unofficial" foundations and would "intentionally" make "no distinction between" those acting "in an official capacity or an unofficial capacity because" they wanted the "exponential effect" of wider dissemination. 5/27/25 Tr. 75:17–23. Unofficial foundations, however, "often" had "someone within" the "unofficial" entity with "some touch point" or "someone closer to or actually in The Islamic State who can give them guidance" on their publications. 5/27/25 Tr. 76:2–5.

### ii. OCE (Ibraheem)

The Government next called an FBI online covert employee, or "OCE," who testified under the name "Ibraheem." This was the same name he used when engaging with Defendant. 5/27/25 Tr. 95:2–10. The OCE testified credibly regarding the following events.

The OCE, an Arabic linguist with the FBI, testified that he was asked to access and view the Telegram channel for Khattab Media Foundation in connection with the investigation of Ashraf Al-Safoo. 5/27/25 Tr. 96:5–11. The Telegram channel was public, meaning anyone could gain access to it. 5/27/25 Tr. 96:16. Based on the OCE's review of the Khattab Media Foundation channel, all the articles and videos published on the channel were pro-ISIS. 5/27/25 Tr. 114:11.

On the channel, the OCE found an article by Abu Al-Abbas Al-Iraqi discussing the Syrian opposition to ISIS. The OCE commented on the post and started a conversation with Defendant on Telegram around February 6, 2018. 5/27/25 Tr. 96:23–97:8. This initiated an ongoing relationship between the OCE and Defendant via encrypted Telegram messaging that lasted until August 2018. 5/27/25 Tr. 97:12–98:3. The OCE preserved these conversations, shown in GX 900, GX 901, and GX

7

904, and the conversations were translated into English by other FBI linguists, shown in separate, translated exhibits.

The OCE and Defendant carried on conversations that were pro-ISIS in nature, and Defendant sent several articles to the OCE that criticized certain groups resisting ISIS. 5/27/25 Tr. 100:14–103:13. On February 16, 2018, the OCE sent Defendant a message saying he lived in Turkey. GX 900T. Defendant asked him to "delete" the message "immediately," adding "Why did you mentioned the place where you live?" *Id.* The OCE understood that Defendant wanted "to be protected" from exposing his location "as an operational security" matter. 5/27/25 Tr. 103:23–104:7. On the same day, the OCE asked Defendant if he thought Telegram was "not safe" or what Defendant would "advise" instead. GX 900T. Defendant replied "Do you have VPN? Have both of them always on, and you'll be safe by the will of Allah." *Id.* The OCE testified that VPN allows Internet users to browse securely and avoid geographic monitoring, and he understood Defendant's comment to again refer to maintaining operational security. 5/27/25 Tr. 104:16–21.

On February 21, 2018, Defendant asked the OCE why he had not joined the fighting with ISIS. GX 900T. The OCE replied that he was "with the brothers" but suffered a wound in the eye, adding that "It's a long story" and it might not be "safe telling you here." *Id.* Defendant replied, "Do you know about secret chat?" *Id.* The OCE replied, "Maybe private chat?" and Defendant asked, "On Telegram?" *Id.* The OCE answered, "Yes, a secret chat," and Defendant responded, "Is encrypted." *Id.* The OCE testified that he understood Defendant's suggested move to an encrypted chat to be another operational security measure. 5/27/25 Tr. 106:1–2. The OCE and Defendant continued their conversation in an encrypted chat and the OCE asked Defendant, "Are you with the brothers?" (GX 901T), which the OCE testified referred to ISIS. 5/27/25 Tr. 107:17–20. Defendant replied, "Supporter" and added, "I really want to go back, brother. Allah willing, I will." GX 901T. The OCE understood this to mean Defendant was considering returning to Iraq to join ISIS. 5/27/25 Tr. 107:23–108:3. Defendant also told the OCE that he wanted "to do nafeer," (GX 901T) which the OCE testified meant joining "a battlefield to fight the enemies." 5/27/25 Tr. 108:13–14.

Later in the conversation, the OCE asked Defendant, "Where are you in Europe?" but Defendant only replied, "It doesn't make any difference, brother," and did not reveal his location. GX 901T. The OCE then asked Defendant if he had "the intention," to which Defendant replied, "Yes, indeed. I can't wait, brother." *Id.* The OCE testified that the "intention" was "a very key" term for the Mujahadeen and for Muslims generally, because declaring one's intention signified that Allah "is monitoring your intention," and therefore a person "can't lie" about their true thoughts or plans. 5/27/25 Tr. 109:13–20. The OCE and Defendant continued the conversation, discussing certain ISIS military operations in the Middle East. The OCE told Defendant "Allah willing, we will meet in the land of the caliphate," (which

8

he testified referred to ISIS territory, 5/27/25 Tr. 112:16–19) and Defendant replied, "Amen, but I'm going back to Iraq." GX 901T.

Defendant later messaged the OCE and told him, "I will send you an article before it is published," and then sent an article he described as "commenting on the video 'From Inside.'" GX 901T. The OCE testified that he was familiar with the "From Inside" video and knew it featured ISIS battlefields and fighting operations. 5/27/25 Tr. 114:2–5. The article written by Defendant, consistent with all other media on the Khattab Telegram channel, was pro-ISIS. 5/27/25 Tr. 114:11. The OCE then told Defendant that he had heard some people "calling" to return to "Twitter," and asked Defendant if he had an account. GX 901T. Defendant replied, "Not really." *Id.* Later, the OCE said, "Some of the brothers were calling to go and support on Twitter," and Defendant responded that "It is important to do that on Twitter, Facebook, and Instagram." *Id.*

The OCE also reviewed Defendant's personal Telegram channel, which he located through Defendant's posts on the Khattab general Telegram echannel. 5/27/25 Tr. 116:1–6. The channel username was Abu Al-Abbas Al-Iraqi, which the OCE understood to be the Defendant's Telegram profile name. 5/27/25 Tr. 117:23–25. The OCE preserved screenshots of this channel. *See* GX 904. As seen in the screenshots, Defendant reposted numerous articles, headlines, and other material from official ISIS media outlets. GX 904T.

Defendant eventually invited the OCE to join the Khattab Writers Group, where he was expected to proofread articles before publication. Through this invitation, the OCE gained private access to both the Khattab Writer's Group Telegram communications and the Khattab members' Telegram group communications. 5/27/25 Tr. 119:19–120:4. Both chats required invite links to join. 5/27/25 Tr. 120:2–121:11. The OCE preserved these all of these chats as part of the investigation. *See* GX 100; GX 200.

Based on his review of these communications, the OCE determined that the Defendant was the "manager" of the Writer's Group, "guiding them" in terms of "what themes and what articles" the members needed to write about. *Id.*

### iii. Special Agent Wherfel

The Government's next witness was Special Agent Francis Wherfel. Special Agent Wherfel testified credibly regarding the following information.

In October 2018, Special Agent Wherfel was assigned to a counterterrorism unit, named "CT6," within the FBI. 5/27/25 Tr. 134:25–135:135:2. This unit focused on the Afghanistan-Pakistan region and conducted investigations related to certain terrorist organizations, including ISIS. 5/27/25 Tr. 135:5–14.

9

Around October 2018, Special Agent Wherfel was a member of the search team conducting a search warrant at 5225 North Virgina Avenue in connection with the investigation into Ashraf Al-Safoo. 5/27/25 Tr. 135:15–25. He was not the primary case agent in the investigation and testified that the primary case agent was responsible for evidence tying the search location to Defendant. 5/27/25 Tr. 142:4–8; 5/27/25 Tr. 143:13–15. Special Agent Wherfel identified photos of the search shown in GX 1506 and identified several physical items recovered in the search. These included a binder recovered from a closet (GX 1505), Western Union receipts found inside the binder (GX 1500), and a computer tower (GX 700). 5/27/25 Tr. 137:15–141:19.

### iv. Yasir Al-Anzi

The Government's next witness was Yasir Al-Anzi, whose testimony took place via a pre-recorded deposition under Rule 15 per prior order of this Court. *See* [382]. This deposition was played for the Court through GX 2500, with pauses for the Court to rule on objections as necessary. Although, as the Court noted at trial, the translation issues made some linguistic "nuance" in the testimony difficult (5/27/25 Tr. 155:24–25), the Court finds Mr. Al-Anzi testified credibly regarding the following events and information.

At the time of his testimony, Al-Anzi was convicted for being a member of ISIS and actively serving a twenty-year prison sentence in Iraq for that crime. GX 2500 at 9. Al-Anzi testified that he was participating in the Rule 15 deposition voluntarily and did not receive anything from either the government of the United States or Iraq in exchange for his cooperation. *Id.* at 11.

Al-Anzi joined ISIS around July or August of 2014 and remained a member until his arrest in 2019. *Id.* at 12, 17. At first, Al-Anzi only provided ISIS with "information," but later officially joined the organization, which required him to take a pledge, "just like a contract." *Id.* at 13. After he officially joined ISIS, Al-Anzi did media-related work for the group because he had prior experience in that field. *Id.* at 14. Al-Anzi testified that ISIS placed significance on media for "many reasons," including its recruiting efforts, getting its message out to its followers, and terrorizing its enemies. *Id.* at 15.

Consistent with Dr. Levitt's testimony, Al-Anzi testified that ISIS maintained a central media department responsible for organizing ISIS's media efforts. After 2015, Al-Anzi worked as a "Scenarist" for ISIS, mainly writing and publishing news articles. *Id.* at 21. In 2017, Al-Anzi became the "emir" of media operations for ISIS's Al-Anbar province in Iraq and held that role until his arrest in 2019. *Id.* at 22–23. ISIS did not actually control the Al-Anbar territory while he was the emir; Al-Anzi

10

performed his leadership role while living in ISIS-controlled Syria when ISIS was still effectively governing the region. *Id.* at 24.

Al-Anzi testified that in his leadership role, he would collect information and send it to the central media. *Id.* at 25. The central media would then either ask him to publish the material, correct it in some way, or not publish it at all. *Id.* Consistent with other testimony, Al-Anzi identified the following organizations as official ISIS media: Al-Furqan, Al-Hayat, Al-Furat, Al-Bayan, and Al-Naba. *Id.* at 26–30; 83. These organizations were all created by ISIS and based within ISIS territory. *Id.* at 31. Again, consistent with Dr. Levitt's testimony, Al-Anzi testified that in addition to the ISIS official media groups, there were also unofficial media groups existing on the Internet. *Id.* at 32. Although ISIS did not have a relationship with all of the unofficial groups, there were some that worked under ISIS publishing "whatever" ISIS directed. *Id.* at 33. ISIS central media would provide instructions to both official and unofficial foundations on what to publish and communicate those orders through the Internet in various ways, such as Telegram. *Id.* at 34; 92–94. Al-Anzi testified that the central media would give warnings about certain unofficial media foundations who did not follow ISIS directions, and that it would tell supporters not to listen to certain groups. *Id.* at 83.

After a translation clarification, Al-Anzi testified that he was familiar with the unofficial ISIS media organization Khattab. *Id.* at 48–49. He had read "two or three" of their publications but could not recall any specifics. *Id.* at 50. Although the organization never officially claimed they were part of ISIS, Al-Anzi testified that Khattab did publish on behalf of ISIS and if Khattab posted information that went against the direction or wishes of ISIS central media, they would lose supporters of their content. *Id.* at 49–51; 93. Organizations of Internet supporters like Khattab provided support to ISIS because they increased the amount of content ISIS could release and amplify. *Id.* at 96. Al-Anzi did not personally know if Khattab ever took direct orders from ISIS. *Id.* at 100.

Al-Anzi testified he was familiar with a person named Abu Al-Abbas Al-Iraqi. *Id.* at 38. He did not meet this person but only communicated with him on Telegram starting sometime in 2018. *Id.* During an interview with the FBI in Baghdad after he was arrested, Al-Anzi learned that Abu Al-Abbas Al-Iraqi was the same person as Ashraf Al-Safoo. *Id.* at 54–55; 79.

Al-Anzi and Defendant were first connected through a Telegram group chat that existed to share information about ISIS activity in Fallujah and other news. *Id.* at 39–41. Defendant joined the Telegram group some time in 2018. *Id.* The group chat contained lots of news about ISIS, and Al-Anzi also posted "a lot" of ISIS news in the group. *Id.* at 46. Al-Anzi recognized the photo of the Al-Nuri mosque in GX 2400 as Al-Iraqi's profile picture. *Id.* at 42–43. He did not recall if Al-Iraqi posted anything himself in the group chat about ISIS, but he did recall him sharing opinions

11

and engaging in discussions in the group. *Id.* at 47; 79. Al-Anzi testified that he was not in a position to give Al-Iraqi orders or instructions related to media because only ISIS central media would provide directions and instructions. *Id.* at 80.

During their conversations, it became "clear" to Al-Anzi that Al-Iraqi was an ISIS supporter, though he could not recall any specific details that led him to that understanding. *Id.* at 45. It also became apparent to Al-Anzi that Al-Iraqi resided in America, based on his word choices and later money transfers between them. *Id.* at 55. Al-Anzi testified that an ISIS supporter could not be an official member of ISIS because a person had to reside within ISIS territory to become a member. *Id.* at 78; 96. Supporters also did not have to follow orders from ISIS as a member must, and supporters did not receive the monthly salaries like members did. *Id.* at 78; 99. Therefore, Al-Anzi testified he believed Al-Iraqi was not an official ISIS member "only because he" was "outside the territory of ISIS." *Id.* at 78.

Al-Anzi testified that Al-Iraqi sent him money "two or three" times, including one transaction of $400. *Id.* at 51. In that transaction, Al-Iraqi sent the money through Western Union. *Id.* Al-Anzi testified he could not use his own name, so he gave Al-Iraqi a different name, testifying that a Western Union employee provided him the name "Zaid" to use for the transaction. *Id.* at 51–52. The money was routed to a currency exchange in Sulaymaniyah, a city in Kurdistan which was never under ISIS control. *Id.* at 88–89.

Al-Anzi testified that the idea of sending money emerged when he and Al-Iraqi discussed the poor living conditions of the people residing in ISIS-controlled parts of Syria. *Id.* at 53. Al-Anzi did not remember how he specifically used the money from each transaction with Al-Iraqi but recalled that once he distributed the money to buy food for multiple families in the region, and another time he bought medicine for a different individual. *Id.* at 53–54. Al-Anzi told Al-Iraqi how he spent the money after these transactions. *Id.* at 54.

Al-Anzi also testified that he recognized the name Abu Abeyda as another individual who was "active" in the same Telegram group where he met Al-Iraqi. *Id.* at 56. He testified that he asked Abu Abeyda to open an Twitter account for him because his accounts on Twitter would get deleted. *Id.* at 59.

### v. Frank Esha

The Government next called FBI language specialist Frank Esha. 5/28/25 Tr. 22:6–7. At the time of his testimony, Esha had worked as a language specialist with the FBI for 28 years, specializing in the Iraqi dialect of Arabic. 5/28/25 Tr. 22:13–14. Esha is a native Arabic speaker and spoke English in all of his employment activities prior to joining the FBI in 1997, including while he served in the military. 5/28/25 Tr. 22:15–24:15. Esha received training from the FBI to become a language specialist

12

and maintains the highest score on FBI's language skills test for English and Iraqi dialect Arabic translation. 5/28/25 Tr. 24:19–25:4. He also maintains passing proficiency in the Yemeni dialect of Arabic. 5/28/25 Tr. 26:6–9. Esha regularly participates in ongoing training with the FBI and testified that when a language specialist translates a document, another specialist checks their work. 5/28/25 Tr. 25:7–16.

The Government offered Esha as an expert witness in the translation of Arabic documents without objection, and the Court accepted Esha as an expert witness under Rule 702. 5/28/25 Tr. 26:15–16. Esha testified credibly regarding the following evidence obtained in this case.

Esha identified Government Exhibits 100 and 101 as disks containing documents that he reviewed and personally signed and dated. 5/28/25 Tr. 27:17. The former disk contained Arabic documents and other materials, while the latter contained English translations of those same materials. 5/28/25 Tr. 27:22. Esha also reviewed Government Exhibits 200 and 201. Similarly, these exhibits were two disks, one of Arabic-language materials and another with English translations of those materials respectively, signed and dated by the Esha. The Government moved all of these disks into evidence, and they were admitted without objection. 5/28/25 Tr. 29:14–25.

Finally, Esha testified that a third disk contained other Arabic documents and English translations not on the previous disks. 5/28/25 Tr. 30:10–24. The Government then moved this longer series of exhibits into evidence, and they were admitted without objection. *Id.*

### vi. Hawazen Mahmood Mothafar

The Government's next called Hawazen Mahmood Mothafar, who testified credibly with the aid of a translator regarding the following events.

Mothafar pled guilty to providing material support, namely services, to ISIS in 2020, specifically though operating a media foundation that serviced ISIS. 5/28/25 Tr. 43:22–44:9. Mothafar voluntarily testified in hopes of receiving a more favorable sentence but did not receive any promises regarding his testimony. 5/28/25 Tr. 44:10–22.

Mothafar immigrated from Baghdad, Iraq to the United States in 2013. 5/28/25 Tr. 45:16–18. Mothafar testified that he has never had gainful employment while living in the United States. 5/28/25 Tr. 46:2–4. Instead, from 2015 through 2020, Mothafar spent an estimated eight to ten hours per day "supporting ISIS." 5/28/25 Tr. 46:5–8; 5/28/25 Tr. 47:4–10. Mothafar provided this support through media activities, specifically "posting news" and starting "a media foundation" called

Sunni-Shield that "worked on graphics, articles," and similar media products. 5/28/25 Tr. 46:14–25. In addition to his own foundation, Mothafar also assisted other ISIS-supporting media foundations. 5/28/25 Tr. 47:1–2.

Consistent with other testimony, Mothafar testified that many official and unofficial media foundations existed to support ISIS. 5/28/25 Tr. 56:9–10. Although both types of organizations produced wide varieties of media, including graphics, articles, videos, and songs, the official foundations were created by ISIS and run directly by ISIS central media, while the unofficial ones were started by ISIS supporters. 5/28/25 Tr. 56:4–16. Mothafar identified Al-Furqan, Al-Hayat, and Amaq as examples of official ISIS media foundations, again consistent with other testimony. 5/28/25 Tr. 65:3–15. Mothafar added that he was familiar with the following unofficial supporter foundations: Al-Batar, Aswirti, and Antaj Al-Ansar. 5/28/25 Tr. 68:16–69:12. Mothafar also recognized the term Bank Al-Ansar, which he testified was affiliated with the Al-Faruq foundation. 5/29/25 Tr. 35:19–20. That foundation specialized in offering social media accounts to ISIS supporters. *Id.*

Mothafar testified he first learned of ISIS around 2014 by following news about Iraq. 5/28/25 Tr. 47:2–15; 5/28/25 Tr. 49:22–24. Mothafar eventually opened a Facebook account under the name Al Assad Al-Rifai for the purposes of sharing ISIS content. 5/28/25 Tr. 48:12–23. He also began posting ISIS content on Twitter. 5/28/25 Tr. 29:25–50:2. Mothafar testified that it was "better to have a fake account" than to use his real name, so he could avoid detection from law enforcement. 5/28/25 Tr. 49:8–17. He added that using fake names on the Internet was a common practice among ISIS supporters and members.

Later, Mothafar was introduced to Telegram by an individual with the username Ahmed Al-Rifai on Facebook, who told him to set up a Telegram account. 5/28/25 Tr. 50:7–51:4. Mothafar testified that the Telegram application utilizes both "channels" and "groups." 5/28/25 Tr. 51:11–20. In groups, multiple people can join, and every participant can post and discuss with the other members. *Id.* In channels, only the administrator or "admin" can post within the group and the other members can only read what the admin posts. Mothafar testified that ISIS members and supporters preferred Telegram over other social media applications because their accounts were deleted with less frequency than on other traditional platforms. 5/28/25 Tr. 51:21–23.

When he first became active on Telegram, Mothafar joined Ahmen Al-Rifai's Telegram group and stayed active in the group until his arrest. 5/28/25 Tr. 52:12–16; 53:24–25. This private group required an invite link to join. 5/29/25 Tr. 78:4–17. Mothafar described this process as one group member nominating a new person into the group, and "if the group agrees, then the new person would be added." *Id.* When Mothafar first joined, the group had around 30 members, all of whom were ISIS

supporters and fighters. 5/28/25 Tr. 53:4–10; 5/29/25 Tr. 78:18–19. Mothafar eventually became an "admin" of the group. *Id.*

Consistent with other testimony, Mothafar explained that a "supporter is a person who is outside the territories that" ISIS controlled and "only" provides media support, while fighters were physically present in ISIS territories and fighting "with them," although Mothafar noted that there were also people inside ISIS territories who were supporters and not official members. 5/28/25 Tr. 53:13–23. Mothafar added that although supporters outside ISIS territory cannot swear Bayat, or the official oath of allegiance, supporters are still "obligated to follow the directives" of ISIS "as well" because "if they do not comply," they are not supporters. 5/29/25 Tr. 58:25–60:12.

Mothafar testified that at least one of the members of the Al-Rifai group, Abu Ammar, was a member of ISIS. 5/28/25 Tr. 58:5–8. He came to this understanding because Abu Ammar would bring the group information about ISIS military activities, and Mothafar also would sometimes ask him "media-related questions." 5/28/25 Tr. 58:10–12. As an example, Mothafar testified that on one occasion he wanted to redesign and republish a certain ISIS image, and he asked Abu Ammar whether it was "allowed or not." 5/28/25 Tr. 58:17. Because he wanted to change the image, Mothafar felt he should ask Abu Ammar since "he was the only one in the group that was known to be with them," meaning ISIS, and Mothafar's idea "was not a normal republication." 5/28/25 Tr. 58:24–59:11. Ordinarily, supporter foundations did not need ISIS central media's prior approval before posting pro-ISIS content. 5/29/25 Tr. 72:2–8.

Mothafar testified that his foundation, Sunni Shield, published a variety of strictly pro-ISIS material, including republishing official ISIS media. 5/28/25 Tr. 59:20–60:4. Sunni Shield would publish these materials on Telegram and later developed a magazine called Al-Anfal. 5/28/25 Tr. 60:9–12. Mothafar also assisted other foundations, specifically Fursan Al Rafa, or "Knights of the Uploading" in English, Khattab, and Nashir News Agency (distinct from the Nashir Al Dawla Islamia, an official ISIS channel). 5/28/25 Tr. 60:21–23. Knights of the Uploading, in particular, was a foundation that took ISIS-related publications, uploaded them to multiple websites, and shared the links with other supporters. 5/28/25 Tr. 65:16–19. Mothafar testified that it was common for the media foundations to have subgroups dedicated to certain types of media, such as a subgroup for graphic designers or writers, and to collaborate with other foundations. 5/28/25 Tr. 61:21–62:12.

Between 2017–2018, Mothafar estimated approximately 10 to 15 unofficial supporter media foundations existed. 5/28/25 Tr. 62:16. Mothafar testified that there was a distinction between the "trusted" and "untrusted" supporter foundations. Trusted foundations were those trusted by supporters and ISIS central media, and their status could change depending "on what they published." 5/28/25 Tr. 63:13–19.

15

Mothafar pointed to a foundation called "Al-Wafa" as an example of a foundation that "was trusted but later on became untrusted" by ISIS. 5/28/25 Tr. 63:17–19.

Mothafar testified that ISIS central media maintained contact with trusted supporter foundations through a Telegram group run by an individual with the username Abu Hamza. 5/28/25 Tr. 66:1–15. Mothafar became a member of that group and represented Sunni Shield within it. 5/28/25 Tr. 69:23–25. He did not definitively recall whether Khattab was represented in the group, but noted it was "possible" they were around in 2018. 5/28/25 Tr. 70:16–20. Eventually, leadership of that Telegram group transferred from Abu Hamza to Abu Ahmed, another person "from [ISIS] central media." 5/28/25 Tr. 70:21–25. Mothafar testified that he knew Abu Ahmed was connected with ISIS central media because he gave "guidance" to the group "for campaigns and such things." 5/28/25 Tr. 71:2–4.

According to Mothafar, ISIS viewed media as important to its mission so they could spread their messaging to "the entire world." 5/28/25 Tr. 66:20. To that end, ISIS relied on supporter foundations to publicize their specific media campaigns, and the central media would give the supporter foundations "guidance" and order them "to unify all publications" and "all the designs" under "one unified theme from a specific date to a specific date." 5/28/25 Tr. 66:20–67:8; 5/28/25 Tr. 69:15–18. One of the reasons ISIS relied on supporter foundations for this purpose was "Internet availability," since ISIS members were in combat within ISIS territory and therefore "were not able to be available online 24/7." 5/29/25 Tr. 23:20–22.

Consistent with other witnesses, Mothafar testified that these ISIS campaigns would sometimes focus on particular world events. 5/28/25 Tr. 72:9–11. The supporter foundations would receive direction from ISIS central media and instructions on specific campaign themes and material through the Al-Hamza group and would be expected to produce media consistent with the theme of the campaign, including incorporating the ISIS campaign hashtags into their content. 5/28/25 Tr. 71:8–72:17.

Mothafar testified that before his foundation Sunni Shield was a "trusted" foundation and before he was in the Abu Hamza Telegram group, Sunni Shield participated in campaigns via a contact inside the Al-Batar foundation, named Abu Abdel Al-Aziz, who would send Mothafar "information about forthcoming campaigns" so his foundation could also "get ready for it." 5/28/25 Tr. 73:6–9. When Al-Aziz would pass him information, he understood the campaigns were coming from ISIS central media because he "trusted" Al-Aziz and additionally, when the campaign would commence, he noticed "all the foundations" would publish around the same theme. 5/28/25 Tr. 73:19–74:1. Mothafar also testified that if he had views that differed from the messaging in ISIS media, he did not feel free to share those divergent views through a supporter foundation. 5/29/25 Tr. 22:22–25.

16

After he was added to the Abu Hamza group, Mothafar provided similar information about campaigns to members of Khattab from the Abu Hamza group. 5/28/25 Tr. 73:12–18. Specifically, Mothafar took information Abu Hamza posted in the group, such as the name of the campaign and any video or audio files provided to help the supporter foundations "develop material," and forwarded those posts to Abu Huthafa, a member of Khattab. 5/28/25 Tr. 74:8–22. He would also tell Huthafa that these campaigns were coming from ISIS central media. 5/29/25 Tr. 80:9–13.

Mothafar testified that he was familiar with the username Abu Al-Abbas Al-Iraqi and developed a friendship with that person after meeting him in the Al-Rifai Telegram group. 5/28/25 Tr. 76:4–18. They began private messaging and would mostly discuss topics related to supporting ISIS. 5/28/25 Tr. 77:3–6. Through their messages, Mothafar learned that Al-Iraqi belonged to the Khattab Media Foundation and learned he resided in the United States based on certain statements he made (such as a reference to buying a gift card at Target). 5/28/25 Tr. 77:7–20. He did not know Al-Iraqi's real name. 5/28/25 Tr. 77:21–22.

Mothafar first became familiar with Khattab in 2017 and recalled that they published different types of ISIS-related media in a wide variety of places. 5/28/25 Tr. 78:12–20. He testified that between 2017 and 2018, when he would pass campaign information to Huthafa, Khattab would follow through on that information and participate in the ISIS campaigns. 5/28/25 Tr. 78:21–23; 80:1–6.

Mothafar joined Khattab on October 2, 2018, specifically by joining the Khattab members' Telegram group. 5/28/25 Tr. 81:1–82:2; GX 325. Mothafar testified that Abu Al-Abbas Al-Iraqi was a member of the group and Al-Iraqi greeted him using the username "Abbusi," which Mothafar recognized as a name Al-Iraqi used. 5/28/25 Tr. 83:12–84:4. Mothafar also joined the Khattab graphic designers Telegram group, but believed that, like most foundations, there were other subgroups within the Khattab foundation. 5/28/25 Tr. 83:1–4.

Mothafar testified to numerous Telegram conversations he shared with Al-Iraqi concerning ISIS videos and graphics, and posts from other users. 5/29/25 Tr. 5:8–15:10. In one conversation, Al-Iraqi asked him if he believed the Telegram application on a computer is "safe." GX 402-5. Mothafar testified that he understood Al-Iraqi to be asking if the application was safe from tracking by law enforcement. 5/29/25 Tr. 5:19–6:1. Mothafar testified that he knew that his work with the media foundations violated U.S. law and that it presented a legal risk to him. 5/29/25 Tr. 6:2–8. In the conversation, Mothafar responded to Al-Iraqi "I don't know, but I use it," and Al-Iraqi replied that he would use it also. GX 402-5. In a later message, Al-Iraqi referenced Nord VPN, which Mothafar recognized as software that obscures a device's location. GX 402-5; 5/29/25 Tr. 6:22–4. Mothafar himself used a VPN to avoid identification by law enforcement. 5/29/25 Tr. 7:7–12. Mothafar also recognized

17

a message sent by Al-Iraqi on October 13, 2018, about leaving the Khattab Foundation. GX 402-5.

Based on his experience with supporter media foundations, Mothafar testified that member productivity remained a consistent issue. 5/29/25 Tr. 19:10–13. This presented a problem for a foundation's leadership, because if members did not produce content, then the foundation could not publish material. 5/29/25 Tr. 19:14–16. Khattab also dealt with this issue, as shown by posts Huthafa and Al-Iraqi put on the Khattab chat pushing members to work harder and produce more content. *See* GX 200-344.

Mothafar testified concerning an incident involving the Al-Wafa foundation, referenced above. Al-Wafa was a supporter foundation and considered "one of the best" before it "radically changed" to become "against, not pro" ISIS sometime before Mothafar joined the Abu Hamza group. 5/29/25 Tr. 19:24–20:12. After this shift, ISIS central media made a pronouncement against the Al-Wafa foundation. 5/29/25 Tr. 20:6–7. Mothafar testified that ISIS did not do this publicly, but rather Abu Hamza sent the pronouncement to the members of the Abu Hamza Telegram group "who were representatives of the foundations." 5/29/25 Tr. 20:18–20. In the pronouncement, ISIS warned its supporter foundations "not to deal with" Al-Wafa "and not to publish any content from the" Al-Wafa foundation. 5/29/25 Tr. 20:22–24.

Mothafar identified GX 3300 as the first issue of Al-Anfal, the magazine published by Sunni Shield in November 2017. 5/29/25 Tr. 24:17–25:11. The issue contained articles originally published by ISIS official media, infographics encouraging lone wolf attacks (that Mothafar testified he created, 5/29/25 Tr. 27:8–10), and pro-ISIS articles, including one written by Abu Al-Abbas Al-Iraqi. 5/29/25 Tr. 25:12–30:16. The article was originally published on the Khattab Telegram channel and featured an Al-Hayat emblem. *Id.*

Mothafar also identified GX 604 as the fourth issue of Al-Anfal, published in December 2017. 5/29/25 Tr. 31:7–17. One of the images showed Russian president Vladimir Putin handcuffed in an orange jumpsuit with what appeared to be a masked ISIS fighter standing behind him while holding a knife. GX 604. As Mothafar testified, the text on the image read in part "we will reach you in your very own homes, you disbelievers." 5/29/25 Tr. 32:10–11. Mothafar stated that the purpose of the image was "to terrorize" and he believed there had been some attacks in Russia at the time of the publication. 5/29/25 Tr. 32:14–17. Other items in the issue included an infographic with instructions on how to prepare a detonator, and another article written by Abu Al-Abbas Al-Iraqi with the Khattab media foundation logo visible on the page. 5/29/25 Tr. 33:16–34:15. Mothafar testified that the content of the article focused on critiquing a group or way of thinking called "the deferment" that was not aligned with ISIS's belief system, and that the article had been previously published on the Khattab Telegram channel. 5/29/25 Tr. 34:13–34:25.

18

In addition to his media creation activities, Mothafar testified that he was involved in creating social media accounts for ISIS supporters and members when asked, and understood the accounts would be used to support ISIS. 5/29/25 Tr. 35:1–12. He believed he made less than 100 accounts. 5/29/25 Tr. 35:15. At some point, he learned about a vulnerability in Twitter regarding Hotmail accounts, because videos "about how to open those accounts using those emails" were "widespread" in public Telegram groups for ISIS supporters or members. 5/29/25 Tr. 35:24–36:11.

### vii. Alan Filush

The Government next called Alan Filush, a principal product manager at Microsoft responsible for leading the team in charge of Microsoft Outlook's growth and modernization activities. 5/29/25 Tr. 84:25–85:8. Filush testified credibly regarding the following information concerning Microsoft's Outlook products and practices.

Filush testified that Microsoft maintains two main branches of Outlook: the commercial version sold to business entities, known as Outlook, and the personal branch which offers services through @outlook.com accounts. 5/29/25 Tr. 86:21–87:1. Previously, Microsoft's personal branch was only offered through Hotmail, a brand Microsoft acquired in 1997 as part of efforts to enter the personal email business. 5/29/25 Tr. 87:1–88:6. In 2012, Microsoft rebranded its Hotmail products to Outlook, but users still maintained a choice of creating an Outlook-branded email address or a Hotmail-branded email address when creating an account. 5/29/25 Tr. 87:18–88:13.

In the 2017 to 2018 timeframe, a user could not create an Outlook or Hotmail email address without connecting it to a Microsoft account. 5/29/25 Tr. 89:13. In other words, to create a Hotmail email address, a user would first create a Microsoft account, and then they would be asked if they wanted to set up an email address with that Microsoft account, after which they could choose between an Outlook or Hotmail branded email address. 5/29/25 Tr. 89:13–20.

The first step in creating a Hotmail account is choosing a username, or what the user wants the email address to be. 5/29/25 Tr. 90:13–14. If someone else is already using a user's chosen email address, then the system will prompt the user and report that the address has already been taken. 5/29/25 Tr. 91:1–3. Users must also create a password, provide their first and last name, the country they are creating the account in, and depending on the country, their date of birth. 5/29/25 Tr. 91:6–10. Microsoft applies different rules and policies to the Microsoft account depending on the user's choices "to comply with different laws in different countries." 5/29/25 Tr. 91:13–16. After creating their account, a user will be taken to their new inbox, where an email from Microsoft waits, welcoming them to their new account.

19

5/29/25 Tr. 92:3–6. Filush identified GX 1313-I, GX 1303-F, GX 1303-C, and GX 1323-F as examples of that type of email. 5/29/25 Tr. 92:12–96:7.

In 2017 to 2018, Microsoft had a policy of retiring and reusing closed or abandoned email addresses if the account was inactive for a certain period of time. 5/29/25 Tr. 96:9–97:16. Once the account met the inactivity criteria, Microsoft deleted the account and fully wiped its information from its servers, at which "point the email address associated with that recently deleted Microsoft account would go back into the pool of available email addresses for other people to sign up for." 5/29/25 Tr. 96:17–21. As a result, if someone had a particular email address, did not use the account for the required time and the account was deleted under the reuse policy, another person could open another account using the same email address. 5/29/25 Tr. 97:24–98:4.

Microsoft eliminated the reuse policy in May or June of 2019 after learning that the policy created an opportunity for data to be shared inadvertently, or for the reused email addresses to be abused for fraudulent or malicious purposes. 5/29/25 Tr. 98:23–99:25. Specifically, Microsoft learned that if someone else reused an email address, then the new owner of that email address would start receiving email intended for the previous user. 5/29/25 Tr. 99:20–100:3. This created scenarios where individuals corresponding with the email address "could easily be misled into presuming that" the "same person that previously was emailing from that address" still owned and used email address. 5/29/25 Tr. 100:9–11. Microsoft also became aware of scenarios involving "account takeovers," where because "websites around the world started using email as the method of verifying ownership of accounts, email then became the main attack vector for people looking to take over products and services on the Internet." 5/29/25 Tr. 100:12–17.

### viii.  Nicholas Pickles

The Government then called Nicholas Pickles. Pickles worked for Twitter from 2014 through 2024. Pickles credibly testified regarding the following practices and procedures at Twitter.

Pickles holds a bachelor's in law from the University of Durham, and he initially joined Twitter as public policy manager for the United Kingdom. 5/29/25 Tr. 102:17–103:1. Pickles later became a senior strategist for public policy, then director of public policy, and finally vice president of global affairs. 5/29/25 Tr. 103:2–4. Pickles' primary responsibility at Twitter involved interacting with governments and policymakers about issues affecting the company, particularly in the realm of content management. 5/29/25 Tr. 103:7–104:8.

In the 2017 to 2018 period, Pickles testified that "the most pressing issue governments were raising with the company" involved responses to extremist or

terrorist content.  5/29/25 Tr. 104:11–17.  In his roles at Twitter, Pickles became familiar with Twitter's policies and practices regarding what content was allowed on the platform, what content Twitter would remove, and when Twitter would suspend certain accounts.  5/29/25 Tr. 105:7–17.  Pickles had previously testified before both Houses of Congress and the British Parliament regarding these same policies. 5/29/25 Tr. 105:18–25.

Pickles identified GX 1000 as Twitter's written terms and services which governed the rules of service for the platform.  5/29/25 Tr. 106:9–15.  Twitter had specific terms of services for users in the United States and outside the United States based on the relevant applicable legal framework, along with specific user privacy policies.  5/29/25 Tr. 106:23–107:10.  Twitter also published "Twitter Rules," a "consumer-facing version" of the terms of service describing the policies "in accessible language."  5/29/25 Tr. 107:14–17.  Pickles testified that Twitter maintained specific Twitter rules applicable to extremist groups.  5/29/25 Tr. 107:20–22.

Beginning in 2016, around the time when ISIS started to use social media, limiting terrorist propaganda on the platform became a major focus for the company. 5/29/25 Tr. 108:11–25.  Focusing on 2017 and 2018, Twitter's standard policy was to permanently suspend accounts engaged in the promotion of violent or extremist groups, including ISIS.  5/29/25 Tr. 109:7–23.  If Twitter suspected the content came from a "hacking event," then Twitter would try to remove the content and return the account to its original owner.  5/29/25 Tr. 110:3–6.  Twitter suspended "hundreds of thousands" of accounts from 2017 to 2018 in connection with these types of terms of services violations, but still struggled with "ban evasion" by individuals who had their accounts suspended but then would open new accounts to resume using the platform. 5/29/25 Tr. 111:6–16.  Twitter employed "a variety of techniques and tools" to permanently suspend those users.  5/29/25 Tr. 111:18–22.

Pickles testified that to create a Twitter account, a user would either download the Twitter app or go to Twitter on their browser, choose a username and password, then provide an email address and phone number.  5/29/25 Tr. 112:6–8.  Twitter would confirm both the email address and phone number to verify it "was a legitimate request" and then the account would be created.  5/29/25 Tr. 112:8–11.  Once in the account, only the username and Tweets were publicly accessible; the "subscriber information," or the person's password, phone number and email address were private and not publicly accessible.  5/29/25 Tr. 112:1–22.  Twitter stored this subscriber information on the company's servers, housed in various data centers. 5/29/25 Tr. 113:14–15.  Pickles testified that these servers were connected to the Internet, and to his knowledge, there were no data centers or Twitter servers located in the state of Illinois from 2017 through 2018.  5/29/25 Tr. 115:22–116:4.  If the user logged into their own Twitter account, however, they could see the phone number and email address they had used to open the account.  5/29/25 Tr. 112:16–19.  Further, Pickles testified that only a "small number of authorized Twitter employees" had

21

access to users' private subscriber data. 5/29/25 Tr. 113:5. Other than the user and this small set of employees, the only other way a user's subscriber information may be accessed is if Twitter produces that information to the government through a subpoena. 5/29/25 Tr. 113:7–10.

In 2017 to 2018, Twitter learned of a vulnerability with respect to Twitter users utilizing Hotmail emails. 5/29/25 Tr. 113:22. If a Hotmail user created a Twitter account and then their Hotmail account was deleted and reused, the new Hotmail user utilizing the same email address could go to Twitter and request a password reset email, which would send the reset link to the same Hotmail email address Twitter had on file. 5/29/25 Tr. 114:4–8. The new Hotmail user could then reset the password to the Twitter account and gain unauthorized access to the private account of its original owner. 5/29/25 Tr. 114:8. Twitter learned this hacking technique was being used by ISIS and took steps to limit the vulnerability. 5/29/25 Tr. 114:13–22.

Referring to page 10 of GX 1000, Pickles testified that using the Hotmail vulnerability violated Twitter's terms of service because, among other things, "once you had reset the password, the original owner of the account would not be able to access the account as the password would have changed; so that would interfere and disrupt the ability to access the account." 5/29/25 Tr. 115:14–17.

### ix. Special Agent Austin Varga

The Government's next witness was Special Agent Austin Varga. Special Agent Varga credibly testified regarding the investigation, which the Court breaks down into the following general topics: (1) background of the investigation and Khalid Abuzulaikha; (2) evidence related to identifying Defendant and Defendant's devices; (3) the Khattab Telegram groups; (4) the Khattab Writer's group; (5) the Khattab general members group; (6) Khattab and Al-Wafa; (7) Khattab spreading ISIS material; (8) Khattab's participation in campaigns; (9) Khattab's participation in Twitter raids; (10) Defendant's Twitter activity; and (11) evidence related to Western Union.

#### (1) Background and Khalid Abuzulaikha

Special Agent Varga first started with the FBI in March 2018 and, at the time of his testimony, was assigned to squad "CT6," a unit which focuses on counterterrorism within certain Middle Eastern and Asian countries. 5/29/25 Tr. 120:10–23. In 2018, CT6's geographic focus included the Arabian Peninsula and other parts of the Levant region, including Syria, Iraq, Jordan, Palestine, and Yemen. CT6 also focused on particular foreign terrorist organizations, including Al-Qaeda and ISIS. 5/29/25 Tr. 120:24–121:9.

Special Agent Varga first became involved with the investigation into Ashraf Al-Safoo in October 2018. 5/29/25 Tr. 122:4. He started as a member of the team assisting with interviews and surveillance and later became a case agent in 2020. 5/29/25 Tr. 112:6–9. Pursuant to his involvement with the investigation, Special Agent Varga became familiar with Khattab Media Foundation, which he testified "was a group of ISIS supporters that created and distributed ISIS media on social media" and "primarily" did its work "in Telegram." 5/29/25 Tr. 122:17–20. Special Agent Varga also became familiar with Khattab's work product and internal communications through his review of various materials in the investigation. 5/29/25 Tr. 122:20–123:8.

Special Agent Varga testified that, through the investigation, he became aware of an individual named Khalid Abuzulaikha. 5/29/25 Tr. 123:13. The Swedish government informed the FBI they arrested Abuzulaikha and discovered ties between him and Khattab. 5/29/25 Tr. 123:15–17. The Swedish government provided the FBI with a hard drive containing copies of devices seized from Abuzulaikha during his arrest, and the FBI obtained search warrants for those materials. 5/29/25 Tr. 123:20–124:6. Those devices included cell phones, computers, and removable storage devices such as USBs. 5/29/25 Tr. 132:24–25. Special Agent Varga testified that he reviewed the contents of the extraction of that hard drive. 5/29/25 Tr. 125:14–23. As shown within the Government's 800 exhibit series, the FBI recovered numerous images and videos containing the Khattab Media Foundation logo and other Khattab work product from Abuzulaikha's devices. 5/29/25 Tr. 140:4–144:19.

Special Agent Varga testified concerning some specific items found on Abuzulaikha's devices. Focusing on GX 898T, a translated exhibit of chats found on a cellular device belonging to Abuzulaikha, Special Agent Varga read a message into the record stating "My name is Abu Al-Zubayr." 5/29/25 Tr. 128:18–24. Special Agent Varga testified he was familiar with that name because it appeared "multiple times in the Khattab Media Foundation Telegram chat groups in reference to a user Dir'un Liman Wahhad." 5/29/25 Tr. 128:25–129:5. The username "Shild_dr" was also associated with Abu Al-Zubayr. 5/29/25 Tr. 129:16–20. Based on this evidence and other evidence in the investigation, Special Agent Varga testified he determined the user "Wahhad" was Khalid Abuzulaikha. 5/30/25 Tr. 142:8–10. The FBI also found a Khattab Media Foundation article, specifically the third episode of the Whiffs of Faith series written by Abu Al-Abbas Al-Iraqi, on the devices (and separately found a link to the same article in the Khattab writer's Telegram group, which Abuzulaikha was also a member of, *see* GX 103). 5/30/25 Tr. 91:4–14; GX 884. Special Agent Varga testified that based upon a review of these materials and other items in the investigation, he determined Wahhad, or Abuzulaikha, was the "overall leader of the Khattab Media Foundation." 5/30/25 Tr. 101:15.

Special Agent Varga also testified concerning a chart shown in GX 8019 and translated in GX 8019T. The chart showed a list of categories, matched with a list of

23

names, including auditing, scenario, design, production, releasing, supervising, follow-up articles, uploading, text design, collection, collection of materials, sound, and publishing. 5/29/25 Tr. 133:18–134:8. Special Agent Varga recognized these names from the Khattab Media Foundation "Telegram rooms," including "Abu Al-Zubayr Dir," "Abu Al-Abbas," "Abu Muthanna," "Abu Huthafa," and others. 5/29/25 Tr. 134:16–135:9. The header of the chart in GX 8019T stated: "In the name of Allah, peace and prayers be upon the messenger of Allah. Campaign, words about the religion of the awakenings." 5/29/25 Tr. 135:15–17.

Special Agent Varga testified that, from his review of Khattab materials including the general Khattab members Telegram group and the Khattab writer's Telegram group, he observed the term "campaign" was used to describe "a concerted media effort that included hashtags" and occurred within "a specific time frame" and focused on a specific "topic." 5/29/25 Tr. 135:18–136:11. Based upon his review of Khattab materials, Special Agent Varga testified that the roles listed in GX 8019 were "consistent" with the work that the Khattab members engaged in. 5/29/25 Tr. 136:20–23.

Special Agent Varga also read into the record a separate header in GX 8019 which read "distribution of work." 5/29/25 Tr. 136:25. Item 1 denoted the "writer's section" and read in part that "Abu Al-Abbas will handle the auditing, review, and supervision." 5/29/25 Tr. 137:2–11. Item 5 on the same list separately read in part that "Abu Al-Abbas," and another person "will upload," and all "without exception will participate in the campaign." GX 8019; 5/29/25 Tr. 138:19–24. Special Agent Varga testified that he was familiar with the username "Abu Al-Abbas" as a member of Khattab who later became leader of the Writer's Group. 5/29/25 Tr. 137:15–21.

The FBI eventually identified this user, "Abu Al-Abbas," as Defendant by reviewing third party records containing IP address and cookie information, and through reviewing devices owned by Defendant, including his personal cell phones. Special Agent Vargas testified he also reviewed a voice recording on one of the phones. *See* GX 411. In the recording, the speaker identifies himself as Abu Al-Abbas, speaks about the Khattab foundation, and references several members, including Abu-Huthafa and Abu Al-Zubayr (known to be Abuzulaikha). GX 411. Special Agent Varga identified Defendant as the speaker in the recording based on his multiple occasions of speaking with Defendant in person, listening to him both live and in Defendant's recorded jail calls, and other recordings of Defendant speaking. 5/29/25 Tr. 145:7–19; 5/29/25 Tr. 205:15–206:4.

### (2) Evidence Related to Defendant and Defendant's Devices

Special Agent Varga then testified regarding other pieces of identification evidence for Defendant. Specifically, the Government introduced GX 2900, which Special Agent Varga testified was an N-400 immigration form for Ashraf Muwafaq

24

Al-Safoo. 5/29/25 Tr. 146:8–18. The document provided Safoo's date of birth, country of birth (Iraq), his home address in Chicago, Illinois, his phone number and his email (alsafoo.net@gmail.com). 5/29/25 Tr. 147:3–19; GX 2900. The Government also introduced T-Mobile subscriber records for the Defendant's phone number. 5/29/25 Tr. 148:3–21; GX 2801. Special Agent Vargas testified that the address listed for Defendant's number was the same address listed in GX 2900, and the billing account name was Muawfaq Hassan, who Special Agent Vargas knew to be Ashraf Al-Safoo's father. 5/29/25 Tr. 149:1–14.

The FBI arrested Defendant on October 17, 2018, on the CTA Brown Line in Chicago. 5/29/25 Tr. 149:16–24. Special Agent Varga testified that he watched the arrest through a live feed via CTA security cameras from the FBI office in Chicago. 5/29/25 Tr. 149:21–14. GX 2700 contains the same footage. 5/29/25 Tr. 150:15–24. During the arrest, the FBI seized two iPhones from Defendant, one black and one white. 5/29/25 Tr. 155:16–20. The FBI obtained search warrants for both phones, the contents of which were produced in the Government's 500 exhibit series and 400 exhibit series, respectively. 5/29/25 Tr. 157:3–17. As Special Agent Wherfel testified, the FBI also seized a computer tower from Defendant's residence, the contents of which were contained in the Government's 700 exhibit series. 5/29/25 Tr. 157:21–159:1. Special Agent Varga testified that the computer tower contained information confirming that it belonged to Defendant, including images of Defendant (GX 703-11), an image of his driver's license in the name Ashraf Al-Safoo with the same birthdate and address as listed in GX 2900 (GX 708), an image of a healthcare card belonging to Ashraf Al-Safoo (GX 706), a resume for Ashraf Al-Safoo listing the same phone number from GX 2900 and GX 2801 and the same "alsafoo.net@gmail.com" email address from GX 2900 (GX 709), and a confidentiality agreement with Safoo's name and the same address from GX 2900 (GX 707). 5/29/25 Tr. 159:12–164:17.

Further, the FBI found an email on the computer tower from iCloud to alsafoo@icloud.com. GX 701. The FBI also found an image of the al-Nuri mosque in Mosul, Iraq. GX 703-13. Special Agent Varga testified he recognized the image from the Telegram profile picture of Defendant's alias username Abu Al-Abbas Al-Iraqi. 5/29/25 Tr. 164:23–165:8. Special Agent Varga further confirmed that GX 703-13 was the same image shown in GX 2400, which Yasir Al-Anzi identified as the profile picture of the user Abu Al-Abbas Al-Iraqi. 5/29/25 Tr. 165:12–166:1. Based upon this evidence and other information obtained in the investigation, Special Agent Varga testified that the FBI concluded the Abu Al-Abbas Al-Iraqi user was Defendant, Ashraf Al-Safoo.

Special Agent Varga testified that in addition to this information, the computer tower also contained information about ISIS and the Khattab Media Foundation. Special Agent Varga testified to a "sample" of the many Government exhibits showing ISIS and Khattab material recovered from Defendant's computer tower, including an article written by Abu Al-Abbas Al-Iraqi in the "Whiffs of Faith" series as shown in

GX 713. 5/29/25 Tr. 166:2–178:6. The FBI also discovered a video on the computer tower that contained step-by-step instructions on how to seize and hack into Twitter accounts using the Hotmail vulnerability. 6/2/25 Tr. 28:8–18; GX 710. Special Agent Varga testified that the video found on the computer tower contained a hacking technique "very similar" to the ones in videos from the Khattab Telegram groups. 6/2/25 Tr. 28:17–18.

Special Agent Varga also testified regarding the contents of Defendant's black iPhone, shown in the Government's 500 exhibit series. As shown in the device information displayed in GX 501, the phone number associated with the device was the same phone number tied to the Defendant discussed previously. 5/29/25 Tr. 180:8–25. The email associated with the Apple ID for the device was Alsafoo.net@gmail.com. 5/29/25 Tr. 181:1–3. Within the phone, agents found the various usernames, including: alsafoo.net@gmail.com; iraqimosul@gmail.com; aalsafoo2.net@gmail.com, and aalsafoo@blueboltssolutions.com, among others. 5/29/25 Tr. 18:14–183:19. Special Agent Varga noted that he was familiar with the company BlueBolt Solutions as Defendant's employer at the time of his arrest. 5/29/25 Tr. 183:14–15.

The extraction report also contained data from the Notes application of the black iPhone. GX 504. Special Agent Varga testified that one of the notes contained the text, "Zaid Sabah Abed," which had significance to the investigation because agents obtained evidence that "showed Ashraf Al Safoo sent money to Zaid." 5/29/25 Tr. 185:9–10. Two additional notes contained the text "Ashraf Al Safoo, alsafoo.net@gmail.com." 5/29/25 Tr. 185:21–186:4.

Special Agent Varga testified that he also reviewed items from the extraction report of Defendant's white iPhone, some of which were contained in the Government's 400 exhibit series. 5/29/25 Tr. 186:15–24. The white iPhone had the Telegram application installed and the extraction report recovered numerous Telegram direct messages from the device. 5/29/25 Tr. 188:15–20. Special Agent Varga testified that every Telegram user maintains a unique user ID, a numerical value, in addition to a username. 5/29/25 Tr. 188:21–25. On the white iPhone, every direct messaging conversation had one similar user common to each chat—an account ending in user ID 333 and with the username Abu Al-Abbas Al-Iraqi. 5/29/25 Tr. 189:9–19. Special Agent Vargas testified that because of this commonality, he concluded the user of the device was Defendant utilizing the name Abu Al-Abbas Al-Iraqi. 5/29/25 Tr. 189:24–25. Special Agent Vargas then testified to several messages found on the white iPhone, including messages referencing the "Whiffs of Faith" series written by Abu Al-Abbas Al-Iraqi (GX 402-4), Defendant's resignation from Khattab (GX 402-2), a message sending a Telegram link with the words "Entry is for me, supporters of the State only" (GX 402-3), messages with Abu Ubaydah Al-Rifai, who Special Agent Varga recognized as Hawazen Mothafar (GX 402-5), messages with Abu Muthanna, who special Agent Varga recognized as a Khattab member (GX

26

402-7), discussions with other Khattab members about media campaigns and Khattab production (GX 402-12), and messages about the use of VPNs (GX 402-8). 5/29/25 Tr. 191:14–196:5. Special Agent Varga added that in his review of Khattab materials, there were multiple references to the importance of VPNs and which ones functioned best. 5/29/25 Tr. 196:7–14.

Special Agent Varga also testified concerning a message sent from Al-Iraqi to another Telegram user about a "request from Al-Ansar Bank." GX 402-10; 5/29/25 Tr. 196:23–197:5. Special Agent Varga stated that he was familiar with Bank Al-Ansar through the investigation because it was discussed by Khattab members and he understood it to be "an ISIS support group" that provided "social media accounts to ISIS supporters for the distribution of media." 5/29/25 Tr. 196:18–22.

The extraction report also recovered a message containing username and password information. GX 402-11; 5/29/25 Tr. 197:6–198:7. Special Varga testified that this collection of information resembled other collections of information found in the Notes application of the white iPhone, discussed later in his testimony, and he determined that it detailed login information "used to hack into Twitter accounts," via Twitter usernames and passwords. 5/29/25 Tr. 198:8–199:1.

Special Agent Varga testified about numerous Khattab Media Foundation infographics recovered from Defendant's white iPhone, including an image showing explosions and known ISIS fighters with a textbox saying in part "Do not deploy peace. Go ahead and do not feel any blame from Allah. Conquer the lowlands filled with water. Maximize the assaults with ongoing bloody days" (GX 418-11), and another image showing an ISIS fighter overlooking a Russian soccer stadium with a bomb next to him and a textbox saying in English "Just wait… World Cup 2018" (GX 418-30). 5/30/25 Tr. 3:23–12:3. The iPhone contained numerous other images relating to ISIS or terrorism more generally, including photos of ISIS fighters holding decapitated heads (GX 403-9), images of the 9/11 attacks (GX 403-10), several issues of Al-Naba (GX 410-3 through GX 410-8, GX 410-10), and images of the ISIS flag (GX 403-11). 5/30/25 Tr. 12:4–16:15.

In reviewing the applications on the white iPhone, Special Agent Varga found applications for removing meta data, which "can remove metadata from images" that could potentially be used by law enforcement "to identify an individual." 5/30/25 Tr. 120:17–24; 5/30/25 Tr. 122:18. Special Agent Vargas also observed two VPN applications. 5/30/25 Tr. 121:2–9. The FBI also recovered a tech news bulletin and other infographics on the phone produced by an organization called "Horizons," which Special Agent Varga testified he knew to be an "ISIS media entity that focused on online and cyber" items, "including security." 5/30/25 Tr. 121:11–21. The white iPhone also had Telegram, Facebook, and Twitter installed. 5/30/25 Tr. 122:16–18.

27

Agents also recovered additional data from the white iPhone's Notes application, produced in GX 404. Special Agent Varga testified that one entry contained a reference to Abu Zubayr, a name also referenced in the voice note in GX 411 and a name found in Khalid Abuzulaikha's devices. 5/30/25 Tr. 18:13–19. Special Agent Varga testified that the reference was to "Abu Zubayr as a leader of Khattab," and whether he would return to the organization. 5/30/25 Tr. 18:16–22. Another note entry created on August 27, 2018, contained the text "Zaid Sabah Abed," which Special Agent Varga testified matched a separate note entry found on the black iPhone and was the same name cited by Yasir Al-Anzi in his testimony. 5/30/25 Tr. 19:4–14. Later in his testimony, Special Agent Varga extensively discussed other data found in the Notes application, which the Court recounts below when discussing Defendant's Twitter activities.

In addition to searching Defendant's devices, Special Agent Varga testified that the FBI obtained subscriber records and searchable warrant returns for the following emails: iraqimosul@gmail.com (GX 1800, GX 3003); alsafoo.net@gmail.com (GX 1900, GX 1901, GX 3001, and GX 3002); alsafoo2.net@gmail.com (GX 2000 and GX 2001); alsafoo3.net@gmail.com (GX 2100 and GX 2101) and alsafoo@blueboltsolutions.com (GX 3000). 5/30/25 Tr. 18:23–21:18.

Special Agent Varga testified that he was familiar with records provided by Google that showed accounts linked by either SMS or cookies, meaning that the accounts shared the same text verification number or were accessed on the same device. 5/30/25 Tr. 21:21–22:7. In reviewing the records produced for the above emails, the email address alsafoo.net@gmail.com was linked with the Aalafoo@blueboltsolutions.com, alsafoo.net@gmail.com, and Iraqimosoul@gmail.com emails. 5/30/25 Tr. 22:8–25. All four accounts were also linked with Defendant's phone number (previously noted above). 5/30/25 Tr. 23:1–17. Additionally, the alsafoo.net@gmail.com email had the iraqimosul@gmail.com address listed as its secondary, or backup, email address. 5/30/25 Tr. 24:4–6.

Analyzing the same records for the iraqimosul@gmail.com email, the Aalsafoo@blueboltsolutions.com, alsafoo.net@gmail.com, and Iraqimousl@gmail.com were all listed as related emails. 5/30/25 Tr. 24:15–16. Further, all the emails again listed Defendant's same phone number, and the Iraqimosul, alsafoo2.net and alsafoo3.net emails all had the alsafoo.net@gmail.com email address listed as a secondary email address, among other links, and the records for the alsafoo.net@gmail.com address linked to that account to: alsafoo2.net@gmail.com, alsafoo3.net@gmail.com, iraqimosul@gmail.com, and jamesfoley870@gmail.com. 5/30/25 Tr. 24:17–25, 26:1–11.

Special Agent Varga testified that he recognized the name James Foley as referring to a journalist who was captured and beheaded by ISIS. 5/30/25 Tr. 26:13–14. The FBI later obtained a search warrant for that account, including the IP

28

address information for it, along with the other email addresses discussed. 5/30/25 Tr. 26:20–27:1. As Special Agent Varga testified, an IP address "is an identifier used by Internet companies" that reveals the user and their geographic location. 5/30/25 Tr. 27:20–28:2. The FBI analyzed IP addresses for these email accounts, including the jamesfoley870 account. 5/30/25 Tr. 28:8–21. This analysis revealed multiple commonalities between the accounts, meaning that the accounts were accessed using the same IP address within a very close timeframe, as shown in GX 3200. 5/30/25 Tr. 28:22–32:18.

The FBI also obtained a search warrant for the contents of the jamesfoley870 account and, in reviewing that information, discovered items and information about Khattab, ISIS, and Abu Al-Abbas Al-Iraqi. 5/30/25 Tr. 32:19–33:2. The Government's 600 exhibit series contained some of those items, including editions of Al-Anfal magazine containing the "Whiffs of Faith" series written by Al-Iraqi (GX 604), a video of the ISIS caliph Abu Bakr Al-Baghdadi with multiple official ISIS media foundation emblems visible in the image (GX 607-A), and ISIS videos depicting fighters, violence, and executions (GX 605, GX 606, GX 611, GX 613, GX 614, GX 624), and Khattab Media Foundation articles (GX 610). 5/30/25 Tr. 33:3–34:4. Agents also found videos created by the Khattab Media Foundation that were discussed and posted in the Khattab general members group, specifically the "Brothers in Marawi" video. 6/2/25 Tr. 21:3–25:9; GX 606; GX 313. Special Agent Varga further testified that an image of the Al-Nuri Mosque found in the jamesfoley870 materials was the same image recovered from Defendant's computer tower. GX 703-13; 5/30/25 Tr: 47:24–48:6.

### (3) Khattab Telegram Groups

Special Agent Varga also testified concerning his review of the Khattab Telegram groups, including both the general members' group and the writers' group. The writers' group only had a subset of Khattab members, and included Abu Al-Abbas Al-Iraqi, along with other previously discussed Khattab Telegram users, including Abu Huthafah, Abu Muthanna, and Dir'un Liman Wahhad (a name associated with Khalid Abuzulaikha). 5/30/25 Tr. 46:21–17; GX 102. Telegram users could change their usernames, and members of the Khattab Telegram groups would do so at various times. But the FBI remained able to identify users by various methods, including when other members would reference the user with their old username. 5/30/25 Tr. 54:2–8. For example, in GX 326, the user Abu Shanab is identified as Abu Al-Abbas by Abu Huthafah. Special Agent Varga testified this message was one of the ways the FBI determined that the user Abu Shanab was Defendant. 5/30/25 Tr. 63:16–64:7. Another example included Abu Huthafa identifying Abu Al-Abbas Al-Iraqi as "Abbusi," confirmed by the Abu Al-Abbas Al-Iraqi account replying to the message. 5/30/25 Tr. 166:14–15; GX 227; GX 275.

### (4) Khattab Writer's Group

Members of the Khattab writers' group would often discuss the importance maintaining a consistent workflow of producing articles and publications, and what topics they should cover in their ISIS articles. GX 107; 5/30/25 Tr. 126:15–127:8. Special Agent Vargas testified that members would post instructions for articles in the Khattab writers' Telegram group. 5/30/25 Tr. 101:7. Writers would also post their drafts for editing and then repost the finalized version. 5/30/25 Tr. 101:7–10. As read into the record, Wahhad, Al-Iraqi, and other members posted about article ideas, production schedules, whether "official materials" would be available for certain articles, the importance of producing quality work "to terrorize Allah's enemies," and other related topics. 5/30/25 Tr. 101:2–105:16; GX 103; GX 104.

Special Agent Varga testified that he observed the Khattab Media Foundation evolve as certain individuals were promoted or assigned new roles. 5/30/25 Tr. 130:19–131:1. Defendant was one of these individuals and was eventually promoted from a contributor to the leader of the writers' Group, as shown in GX 108 and consistent with the testimony of prior witnesses. 5/30/25 Tr. 131:11–24; 5/30/25 Tr. 166:3–4; GX 112. Defendant posted immediately after his appointment, providing instructions to the other writers, and at other times posted instructions to other Khattab members on topics such as how to evade law enforcement detection. 5/30/25 Tr. 132:2–133:23; 5/30/25 Tr. 134:16–135:2; GX 108; GX 242; GX 245; GX 247. Defendant also directed the writers to send every article to him "first," and then he would "forward it to the editors," then send it to other Khattab departments before the final "upload and dissemination." 5/30/25 Tr. 173:23–174:4; GX 113. Defendant would also post in the writers' group about coordinating articles for ISIS media campaigns, as shown in GX 114 where Defendant writes "we will begin a campaign which we have called Baghdad of the Caliphate," and provides instructions about the type of articles needed to contribute to the campaign. 5/30/25 Tr. 178:23–180:11; GX 114. Special Agent Varga testified that Khattab did, in fact, later participate in the campaign Defendant referenced, as shown by infographics recovered from Khalid Abuzulaikha's devices. 5/30/25 Tr. 180:8–181:6.

Special Agent Varga testified that Defendant continued to write and publish articles himself, including one where he encouraged supporters to "Rise up, defend and support your brothers and don't allow an opportunity to pass you by. Break into Facebook, invade Twitter, and disseminate on YouTube. Don't leave a country that Allah would like to see you at without showing Allah what pleases him." 5/30/25 Tr. 174:20–24; GX 113.

### (5) Khattab General Group

In the general group, Special Agent Varga testified that the Khattab members would often discuss anonymity or avoiding detection, including the use of VPNs and hiding one's location, as shown by the example in GX 220. 5/30/25 Tr. 50:6–7.

30

Khattab members frequently discussed and engaged in posting ISIS media on social media platforms and would also discuss how to obtain access to Twitter accounts. Special Agent Varga testified that Khattab members used Twitter to "amplify ISIS's message and spread it as broadly as possible." 6/2/25 Tr. 28:3–4.

Special Agent Varga pointed to GX 204 as an example of these types of discussions. There, the user Wahhad told another user to utilize Twitter to post ISIS media and other users posted instructions on how to use Twitter to disseminate ISIS media on the platform. 5/30/25 Tr. 49:2–50:19. Members also discussed how their accounts were often deleted or suspended, posting screenshots of those notifications from Twitter. 5/30/25 Tr. 51:4–10. On page 4 of GX 204, Wahhad posts "We will leave the field for brother Abu Huthafah, so he can copy the tweets for us and we will share them there. And if you want, you can post photos or terrorist videos," with several thumbs up and okay emojis following. GX 204; 5/30/25 Tr. 53:1–19. Defendant was involved in these efforts; as one example, Defendant reposted a link discussing Bank Al-Ansar, which claimed that the group created "9,000 Facebook and 43,000 Twitter accounts for The Islamic State supporters." 5/30/25 Tr. 68:18–25. Special Agent Varga testified that there were other discussions in Khattab Telegram groups about using Bank Al-Ansar to get social media account information. 5/30/25 Tr. 69:1–4.

As another example, Special Agent Varga testified about a post in GX 203, where a user reposted a link to a Telegram channel that "specialized is disseminating the releases of the official media of the Islamic Caliphate right away." 5/30/25 Tr. 60:9–13. Special Agent Varga testified there were numerous instances of Khattab members sharing ISIS official media and "discuss the importance of following ISIS official media" themselves. 5/30/25 Tr. 60:17–18. Defendant himself also posted that they should determine if a video is "official," noting that a particular video appeared "official" because "the brothers at Fursan Al-Rafi released it and the brothers at Fursan take guidance" from ISIS. 5/30/25 Tr. 128:13–129:5; GX 237.

Khattab members would discuss the need to follow the directions and commands of ISIS. For example, in October 2018, Defendant reposted a post from his personal Telegram account in the Khattab general members group titled an "Announcement," and invited anyone interested in joining "the media cadres and sections" to "contact the foundation's" Telegram "bot." 6/2/25 Tr. 18:8–21. The post detailed that "This announcement is to confirm the foundation's continuous support to The Islamic State and in response and following the command of our Sheikhs and leaders of the state, and to anger the infidels and hypocrites in confrontation of them so they know that the state has supporters that don't get tired or bored." 6/2/25 Tr. 18:22–19:2; GX 312.

31

### (6) Khattab and Al-Wafa

Special Agent Varga provided testimony regarding an aborted merger between Al-Wafa and Khattab. Al-Wafa "was an ISIS media group that later fell out" with ISIS "and was essentially excommunicated." 5/30/25 Tr. 92:20–23. Special Agent Varga cited discussions within Khattab about "breaking away from Al-Wafa" after it as "excommunicated by ISIS" and the "fallout" from "other ISIS supporter groups." 5/30/25 Tr. 92:20–23. For example, in GX 889, the FBI recovered a December 9, 2017 document from Khalid Abuzulaikha's devices that detailed Khattab's response and explanation of the dissolution of the merger. 5/30/25 Tr. 93:5–95:1. In it, Khattab states in part that it "raised the matter of the foundation with our brothers and leaders in the caliphate state Council" and "gladly announce our return to our places and our departure from the ongoing conflict, and the conflict which happened and is happening today among the supporters." GX 889. The next day, Defendant posted in the writer's group about the aborted merger, replying to Wahhad and stating in part that they should "let the foundation return to where it was, working under the direction of the Office." GX 103; 5/30/25 Tr. 97:1–5.

### (7) Khattab Spreading ISIS Material

The FBI recovered hundreds of items from Abuzulaikha's and Defendant's devices, in which Khattab members discussed, planned, obtained and or created ISIS images and infographics, for dissemination on social media. 5/30/25 Tr. 56:9–57:14. For example, in GX 208, on September 19, 2017, Abu Huthafah reposted a Khattab Media Foundation post with a list of URLs and notes that it is "for dissemination." GX 208. Special Agent Varga testified that he found such posts "very often" in his review of the material and the links were for members to share the content "outside of this Telegram group," which he verified by observing the "actions that were undertaken by members" in response to "these types of posts." 5/30/25 Tr. 65:9–66:12. As another example, Special Agent Varga testified about Khattab infographics posted in the Khattab general members groups on September 11, 2018. 5/30/25 Tr. 208:25–209:2. These messages told Khattab members the images were "For posting" and depicted images of the 9/11 attacks with text stating in part "Our Upcoming Terror Will Make You Forget What You Saw In The New York And Washington Raids!" 5/30/25 Tr. 209:4–24; GX 307.

Defendant made posts himself encouraging the dissemination of such material, as shown in multiple exhibits. 5/30/25 Tr. 71:17–22. In a July 22, 2018 post, for example, Defendant told the Khattab general members group, "For the millionth time, we reiterate that there is no support on Telegram because it is a closed world exclusive for the supporters. The news did not reach common Muslims. He who thinks is a supporter and is fixated on Telegram only, let him think twice." 6/2/25 Tr. 234:5–11; GX 302.

Examining GX 209, Special Agent Varga testified about another post by Defendant in the Khattab Telegram group containing a YouTube video link showing a still from the video where a fighter holds a decapitated head. On November 6, 2017, Defendant posted the YouTube link with the video title ""#Al-Bayda' Province Support Army" and included the hashtag "#For dissemination" in the body of his post. GX 209; 82:13–83:2. Special Agent Varga testified that he observed a video recovered in the jamesfoley870 account information, contained in GX 622, that had the same #Al-Bayat hashtag as the video link in GX 209, and at the 12:00 minute mark, the video had the same still shot seen in the link's image in GX 209. 5/30/25 Tr. 85:1–2.

In his review of the jamesfoley870 materials, Special Agent Vargas also observed evidence of Defendant posting ISIS videos on YouTube. 5/30/25 Tr. 86: 1–5; 87:7–9, 16–22; 88:5–22; 89:6–19; GX 208, GX 618, GX 619.

### (8) Khattab's Campaign Participation

Special Agent Varga testified that Khattab members often discussed and engaged in ISIS media campaigns and employed various techniques to spread ISIS media more broadly. 5/30/25 Tr. 69:5–7. One of these techniques involved inserting certain hashtags that "would have nothing to do with the media being posted" to increase the viewership of the post. 5/30/25 Tr. 54:24–55:1; 5/30/25 Tr. 111:3–112:14. Defendant helped facilitate the use of this ISIS technique in a repost from his personal Telegram account into the Khattab general members group, instructing other members to post an ISIS video on Facebook and Twitter using certain generic, unrelated hashtags. 5/30/25 Tr. 167:9– 169:8; GX 275.

Khattab members would also talk about and participate in ISIS campaigns. 5/30/25 Tr. 75:13–79:17. Special Agent Varga testified to numerous examples, including GX 117. In that campaign, titled #steadfastness, Abu Huthafa instructed the Khattab Writer's group to "prepare texts for designs" in preparation for the campaign "with the help of brother Abu Al-Abbas" and provided a list of goals for the campaign, including the creation of "Incitement messages to continue fighting and pushing away the infidels by confronting them," and "Threatening messages to the enemies of The Islamic State that it's continuing to carry out its threat to eradicate the roots of disbelief and apostasy sects." 6/2/25 Tr. 12:3–16:1. Defendant echoed these instructions, telling the Writers' group that "the state mobilized us to migrate, but we did not migrate" and instead "they are mobilizing us for media support," and added additional instructions for creating articles for the ISIS campaign. 6/2/25 Tr. 16:9–22; GX 117.[2]

---

[2] GX 327 presented another example. In preparation for that campaign, Khattab members instructed other members to send their posts on private messaging to the Khattab leaders first, so it could be listed within the campaign, informing members that the Telegram "link for the campaign channel" should not be disseminated and that it was only for "the owners of foundations and channels that will take part in the campaign." GX 327; 5/30/25 Tr. 78:21–79:14. Other examples included the "modern

Defendant also posted materials for ISIS campaigns himself. Special Agent Varga testified to GX 327 as an example, where Defendant reposted a Knights of the Uploading post that discussed an "interactive campaign" and urged "the supporters to back their brethren with their writings and verbally and with their inciting video clips and designs or through re-posting the campaign materials," providing a list of "approved hashtags of the campaign" at the bottom of the post. GX 327; 5/30/25 Tr. 79:24–81:13. Defendant later reposted a message about the results of the "breaking the modern idol" campaign that Khattab participated in. 5/30/25 Tr. 143:2–144:8; GX 258. Defendant further encouraged others to participate in another official campaign on August 22, 2018, telling Khattab members they had "been lazy, and I'm the first among you. Let this campaign make us return." 5/30/25 Tr. 204:25–205:21; GX 305.

The evidence also showed discussions between Khattab members about their successful contributions to other ISIS campaigns, exemplified by Defendant's own post in GX 287. As Special Agent Varga testified, Defendant posted a link to an article about a "pro-ISIS group threatens holiday attacks," with an image of Khattab's "our gifts are ready video" depicting explosions in major Western cities and around Christmas-related imagery. 5/30/25 Tr. 181:7–182:5; GX 287. In the message, Defendant writes "People of Khattab, access and see the comments. We are raising their blood pressure. Is VPN necessary? Same thing here," to which another user replied "Ha-Ha-Ha-ha-ha, Las Vegas video is destroying them." 5/30/25 Tr. 181:14–182:3; GX 287.

### (9) Khattab's Participation in Twitter Raids

Khattab members also frequently discussed conducting Twitter raids, which involved "taking over a Twitter account and the members simultaneously posting ISIS content on that Twitter account until the account is deleted or suspended." 5/30/25 Tr. 57:24–58:1. Special Agent Varga testified that the term "Twitter raid" appeared multiple times in the Khattab chats and involved "seized accounts," meaning that Khattab members would hack into existing social media accounts and use them to post ISIS content. 5/30/25 Tr. 146:7; 5/30/25 Tr. 147:1–5. Khattab members discussed the advantaged of using "seized" accounts, as they would often stay on the platform for longer than newly created accounts. 5/30/25 Tr. 207:1–208:24; GX 306.

For example, in GX 202, members in the Khattab Telegram group discussed when a raid was scheduled to occur and what platform it would take place on, and other members sought assistance in obtaining social media accounts so they could join the raid. 5/30/25 Tr. 58:2–22. Members would often discuss the large number of views they could obtain for their content when posted on Twitter and talked about

---

idol democracy" or "break the idol" campaign (5/30/25 Tr. 134:2; GX 245; GX 247; GX 109) and the "awakenings" campaign. 5/30/25 Tr. 144:18–24; GX 260.

"how to extend the amount of time that the account would stay open." 5/30/25 Tr. 59:6–18; GX 219. Additionally, Special Agent Varga testified about a repost from Wahhad that offered an "opening" for "junior supporters who wish to learn the method of support on the # Twitter application with simplified steps and they would be provided with accounts to work on them." 6/2/25 Tr. 9:3–19; GX 308.

Raids often occurred simultaneously with campaigns. In GX 327, for example, the Khattab general group discussed the timing of a campaign Khattab would participate in, and they planned to also "invade Twitter and Facebook with materials of Ashhad Squad, and with other squads on Twitter. We will direct the battalions and publishers towards Twitter to target the accounts" of "tyrants and their scholars." GX 327. In another example, Khattab participated in the "awakenings" campaign, and simultaneously executed a raid, as shown in GX 260. 5/30/25 Tr. 144:18–145:25. Khattab users posted screenshots of accounts they claimed they "seized" and discussed how it was "better to seize" a Twitter account because it will "last longer," noting it takes "one minute only" to hack into an account. 5/30/25 Tr. 147:4–21; GX 260. Other users commented how they could "take" accounts "from Bank Al-Ansar," and exchanged information about a "new method to register in Hotmail and seize Twitter accounts from the emails offered in this channel." 5/30/25 Tr. 147:22–148:9; GX 260. That post, in turn, provided a link to a video and noted that "this technique is only for the supporters of the caliphate." GX 260.[3]

Special Agent Varga testified that the FBI was able to access the video in connection with the link, as shown in GX 317. 5/30/25 Tr. 148:24–149:2. The video provided instructions on how to use a Hotmail email account to seize a Twitter account, giving step-by-step guidance on turning on VPN, setting up a Hotmail account from a list of available, recycled Hotmail email addresses from an unknown Telegram channel, creating a fake phone number through a TextNow-equivalent[4] service, changing the Twitter password using the password reset function through the Hotmail email access, and then entering the Twitter account using the new password. 5/30/25 Tr. 149:2–158:24. Special Agent Varga testified that this video depicted the same technique for hacking into a Twitter account as shown in the video found on Defendant's devices. 5/30/25 Tr. 158:25–159:5.

---

[3] Special Agent Varga testified to other numerous examples of raids, such as the "Reality will be what you see, not what you hear" raid seen in GX 216 (and infographics for which were recovered from Khalid Abuzulaikha's devices), the raid seen in GX 218 involving the Gary Morris Twitter account (5/30/25 Tr.112:17–118:3), and the raid seen in GX 303. 5/30/25 Tr. 203:5–204:1.

[4] Special Agent Varga testified he observed posts about the TextNow temporary number service in the Khattab Telegram materials, which he knew to be a service where an individual can obtain a temporary phone number to use for a limited period of time. 5/30/25 Tr. 119:1–18. In his experience as an FBI agent, individuals using this type of service typically set up temporary phone numbers when setting up different online accounts to "hide the true identity of the account owner." 5/30/25 Tr. 119:22–24.

Defendant actively participated in these efforts to hack Twitter and spread ISIS media. For example, in GX 211, Defendant posted "We must spread fear among them, brothers. Access their media pages." In GX 218, Defendant reposted a message encouraging members to "Gather your strength and set Twitter ablaze." On another occasion, Defendant reposted a message from his personal channel into the Khattab general members group that stated in part, "Participate in the war. Spread terror. The state does not want you to watch it only. Rather, it incites you and, if you are unable to, use it to incite others. Know that rewards are multiplied in the seasons of goodness and betrayal is a grave sin that cannot be forgiven even by fasting the whole month of Ramadan." 5/30/25 Tr. 176:12–20; GX 284. Other messages showed him encouraging others to "invade" Twitter accounts, commenting that the "most important thing" was getting ISIS messaging on the platform. 5/30/25 Tr. 197:17–25; GX 297. Further, Defendant responded to a post in the Khattab general members group that asked, "Does anyone need seized Twitter accounts?" and he requested one of the accounts. 5/30/25 Tr. 191:1–10; GX 293. In a different post, Defendant requested a seized Facebook account. 5/30/25 Tr. 192:6–24; GX 295. Consistent with such messages, the evidence confirmed that Defendant was using Twitter accounts and posting ISIS material on Twitter. 5/30/25 Tr. 175:3–6. For example, Defendant's Notes application showed Twitter login information that correlated with screenshots of Twitter posts found on Defendant's phone. 5/30/25 Tr. 165:11–16.[5]

Khattab members also discussed the use of Facebook for similar types of operations. Special Agent Varga testified to one such example shown in GX 263, where Defendant posted a message stating, "Al-Ansar Bank announces that it is ready to provide the supporters with Facebook and Twitter accounts that are ready to raid the social media, to post the publications of Al Furqan foundation. Allah permitting." 5/30/25 Tr. 163:9–15. Special Agent Varga noted that Al Furqan was an ISIS media entity. 5/30/25 Tr. 163:19.

### (10)    Defendant's Personal Twitter Activities

As mentioned above, Special Agent Varga testified that he determined Defendant personally hacked into and utilized Twitter accounts to post ISIS media and used the same process seen in the Twitter hacking videos found in the Khattab Telegram groups and on Defendant's computer tower. 6/2/25 Tr. 9:20–23; 6/2/25 Tr. 121:23–122:1. This determination arose, in part, from data recovered from the Notes application of Defendant's white iPhone, shown in GX 404. 6/2/25 Tr. 46:5–13. That exhibit displayed the following information for each note: a note number, the body of the note, a translation of the note when the original was not in English, the date the note was created, and the date the note was last modified. 6/2/25 Tr. 46:14–21.

---

[5] Special Agent Varga further testified that he observed posts containing what appeared to be Twitter usernames and passwords in a manner similar to the data recovered from the Notes application of Defendant's white iPhone, with GX 203 presenting an example. 5/30/25 Tr. 61:11–62:22.

In his testimony, Special Agent Varga concentrated on illustrative examples of specific notes within GX 404. Many of those notes contained generic information related to Twitter or Twitter raids, such as the note in Row 30, created and last modified on September 14, 2018, which read, "Sometimes these are media accounts and some fools. Copy the Tweets of the previous attack and directly access the links of the below targeted accounts and access the last Tweet of each account and post a re-Tweet" and then the note included a list of different Twitter account URLs. 6/2/25 Tr. 47:21–48:19. Another example included the note in Row 28, created on September 15, 2018, and last modified on September 16, 2018. This note was titled "Hashtags" and contained a long of relevant hashtags in the body. 6/2/25 Tr. 48:24–49:11. Other notes contained lists of specific Twitter account information, including email addresses and passwords associated with certain Twitter accounts, which remained consistent with use of the previously discussed hacking method. 6/2/25 Tr. 49:14; 6/2/25 Tr. 121:23–122:1.

Special Agent Varga testified to Defendant's hacking activity with respect to several individual Twitter accounts referenced in the Notes application of his white iPhone. The Court recounts that testimony below.

## A. Twitter Account A: @neniiz

Special Agent Varga first testified about the Twitter account information listed in the note in Row 26 of GX 404. The note was both created and last modified on September 17, 2018, and the body of the note contained the following information: "email: gori_627@hotmail.com; username: @neniiz627; password: zxc123; vpn: United States." 6/2/25 Tr. 49:18–50:12. Special Agent Varga testified that the FBI obtained search warrants for both the Hotmail email address and Twitter account listed in the note. 6/2/25 Tr. 50:13–15. According to the records obtained from Twitter, the account with the screenname @neniiz628 was associated with the email address gori_627@hotmail.com. GX 1331. The account was first created on November 19, 2010, and last updated on September 19, 2018. *Id.* Special Agent Varga testified that the records indicated the account utilized an IP address that was geographically tied to Mexico. 6/2/25 Tr. 50:20–51:22; GX 1331. The same records indicated that on September 16, 2018, the username for the account changed from neniiz627 to neniiz628; Special Agent Varga noted that the neniiz627 screenname matched the username listed on Row 26 of GX 404. 6/2/25 Tr. 52:2–7. The FBI also obtained records from Twitter showing the tweets posted by the account ("tweet records"), including the post's "tweet ID," when the tweet was created, the text of tweet, and whether another user was tagged in the post. 6/2/25 Tr. 59:2–21; GX 1331. Special Agent Varga testified that the tweet records for the @neniiz account showed all its tweets were posted on September 17, 2018. 6/2/25 Tr. 60:8–12. The @neniiz account posted several tweets that day, all of which contained Arabic writing and variations on two predominate themes: the first was a reference to official ISIS media and a date in the Islamic calendar (Monday, Muharram 7, 1440), and the second was references

to certain media releases and the text "jihad continues till the judgment day." 6/2/25 Tr. 60:16–61:21.

Search warrant returns from Microsoft, in turn, showed that the gori_627@hotmail.com email address was created on September 16, 2018, and was registered to a name "uef jgdg." 6/2/25 Tr. 52:14–53:14; GX 1333K; GX 1332. The FBI also obtained records showing that the gori_627 email address received multiple emails on September 16. The first, sent at 6:31 p.m., was a "Welcome to your new account in Outlook.com" email written in Arabic from Outlook, addressed to the name "Uef." 6/2/25 Tr. 53:20–54:7; GX 1333C. At 6:32 p.m., the account received an email from Twitter written in Spanish with a password reset link for the account "@neniiz627." 6/2/25 Tr. 54:12–55:8; GX1333I.[6] At 6:33 p.m., the gori_627 received another email from Twitter in Spanish, this time with the subject line "Confirm your Twitter account, Erika B'm," and a message telling the recipient to "confirm your electronic email address to complete your Twitter account at neniiz627." 6/2/25 Tr. 55:14–23; GX 1333A. At 6:37 p.m., the gori_627 address received another email in Spanish, but this time from Facebook. 6/2/25 Tr. 56:1–6; GX 1333E. This email contained the subject "379866 is the code to recover your Facebook account" and a message stating in part: "Hello, Erika. We received a request to reset your Facebook password. Click here to change your password." 6/2/25 Tr. 56:7–21; GX 1333E. Facebook sent another email at 7:13 p.m., stating: "We have noticed you are having trouble logging into your account. If you need help, click the button below and we'll log you in." 6/2/25 Tr. 57:17–58:11; GX 1333B. Below the message, the email provided that the notification was sent in response to "an unsuccessful login attempt on" the account. 6/2/25 Tr. 57:17–58:11; GX 1333B.

On September 17, 2018, at 4:02 p.m., the gori_627 account received another email from Twitter in Arabic addressed to "Erika B'm" with the subject line "Your Twitter account has been reactivated." 6/2/25 Tr. 69:11–23; GX 1333H. Special Agent Varga testified that records from Twitter indicated that the @neniiz account was suspended on September 19, 2018. 6/2/25 Tr. 69:24–70:6; GX 1331.

The FBI also recovered numerous screenshots from Defendant's white iPhone showing (and timed with) Twitter posts by the @neniiz628 account (display name Erika b.m). GX 1331. Special Agent Varga testified that the content of the tweets in the screenshots also matched the content in the tweet records for the account. 6/2/25 Tr. 62:8–66:22; GX 1331. Several of the screenshots were taken with seconds after the tweets were posted, as shown by the time markers in the images themselves, some of which indicated that the displayed @neniiz post had been uploaded two seconds, four seconds, or two minutes before the capture. GX 416. Special Agent Varga also testified that many of the tweets tagged or replied to posts from other Twitter accounts. 6/2/25 Tr. 67:6–69:10. Several of these tagged accounts matched

---

[6] When testifying about this exhibit, Special Agent Varga reiterated that the IP address used to create the Twitter account was linked to Mexico. 6/2/25 Tr. 54:19–21.

those listed on notes recovered from Defendant's white iPhone. *See* GX 404 (Row 25 and Row 30).

Further, Special Agent Varga testified that users could access Twitter from both the app and from a mobile browser. 6/3/25 Tr. 13:20–22. Based on browser history data extracted from Defendant's white iPhone, Special Agent Vargas testified that the device also accessed the @neniiz628 account on September 17, 2018. 6/3/25 Tr. 15:16–24; GX404A (Rows 10057–58).

### B. Twitter Account B: @alfredo

Special Agent Varga next testified about the notes shown in Row 20 of GX 404, which contained Twitter "account information, including a Hotmail email account," gori_399@hotmail.com, "an account handle," @alfredo79917667, "a potential password and" a "note about a VPN." 6/2/25 Tr. 71:20–72:11. The note was first created on September 18, 2018, and was last modified on September 24, 2018. 6/2/25 Tr. 72:13–14. GX 404.

The FBI obtained search warrants for both the gori_399 Hotmail account and the @alfredo Twitter account. 6/2/25 Tr. 72:15–17. Records obtained from Twitter confirmed that the @alfredo account was first created on April 30, 2012, and last updated on September 19, 2018. GX 1301. The account's associated email address was listed as gori_399@hotmail.com. 6/2/25 Tr. 73:2–6; GX 1301. Special Agent Varga testified that tweet records showed that the account only posted tweets on September 18 and 19, 2018. 6/2/25 Tr. 77:2–78:4; GX 1301. All the tweets referred to ISIS fighters, "apostate" groups fighting ISIS, or ISIS official media. 6/2/25 Tr. 78:5–79:17.

Records obtained from Microsoft showed that the gori_399 Hotmail address was created on September 16, 2018, at 11:21 p.m. UTC and was associated with the name "jd jrje." 6/2/25 Tr. 73:8–74:4; GX 1302. The FBI obtained emails from the gori_399 account, including an email from Outlook on September 16, 2018, at 6:21 p.m. which read in part, "Welcome, jd. Welcome to your new account in Outlook.com." 6/2/25 Tr. 74:9–21; GX 1303F. The gori_399 then received an email in Spanish from Twitter at 6:22 p.m. on September 16, 2018, with the subject line "Request to reset password." GX 1303E. The body of the email read in part: "If you requested to reset the password for @alfredo79917667, click the following link." 6/2/25 Tr. 74:24–75:9; GX 1303E. Twitter sent another email to the gori_399 address at 6:27 p.m., again in Spanish, with the subject line "Confirm your account, Alfredo," and provided instructions to confirm the account's "electronic email address." 6/2/25 Tr. 75:21–76:4; GX 1303G. Twitter sent yet another email on September 17, 2018, at 7:18 p.m., once again in Spanish, with the subject line "Security alert: new or unusual new session." 6/2/25 Tr. 76:9–76:13; GX 1303H. Twitter sent an email with the same subject line on at 9:26 a.m., on September 18, 2018. 6/2/25 Tr. 85:20–86:5; GX 1303I.

Finally, on September 19, 2018, at 2:26 a.m., Twitter sent another email that read in part "Your account, Alfredo, was suspended because it fails to comply with Twitter terms." 6/2/25 Tr. 86:9–22; GX 1303D. Special Agent Varga testified that Twitter records indicated that the @alfredo account was suspended on September 19, 2018. 6/2/25 Tr. 87:4; GX 1301.

Once again, the FBI found numerous screenshots of the tweets posted by the @alfredo account on Defendant's white iPhone, several of which were taken one second, two seconds, or ten seconds after the @alfredo account posted the tweet. 6/2/25 Tr. 79:20–85:12; GX 413. Some of the tweets were posted in French, and Special Agent Varga testified that several of those tweets had the "same" content as French language notes found on Defendant's white iPhone, including the emojis used. 6/2/25 Tr. 84:7–85:8. Based on comparing the notes, specifically in rows 17 and 18 of GX 404, to the posts, Special Agent Varga determined the notes were "copied and pasted" into the tweets. *Id.*

Further, Special Agent Varga testified that the browser history from Defendant's white iPhone confirmed that the device accessed the @alfredo Twitter account on September 18 and September 20. 6/3/25 Tr. 13:23–14:6; GX 404A (Rows 10029–32).

### C. Twitter Account C: @kriss182

Returning to GX 404 Row 20, Special Agent Varga also testified about a second grouping of Twitter account information listed in the note with the @alfredo account information. 6/2/25 Tr. 87:9–14. Special Agent Varga determined the second grouping also referred to a Twitter account and included an email, "kris_878@hotmail.com," a Twitter handle, "@kriss182," a password, and a line of text saying "VPN: Poland." 6/2/25 Tr. 88:16–23. Again, the note was created on September 18, 2018, and modified on September 24, 2018. 6/2/25 Tr. 87:22–23. This same account information was also seen in the note in Row 11 of GX 404, created and modified on September 25, 2018. 6/2/25 Tr. 87:24–89:5.

The FBI obtained search warrants for both the kris_878@hotmail.com email address and the @kriss182 Twitter account. 6/2/25 Tr. 89:9. Records obtained from Twitter showed that the @kriss182 account was first created on September 24, 2009, and was last modified on September 25, 2018. GX 1311. The account was associated with the kris_878@hotmail.com email address. 6/2/25 Tr. 89:20–23; GX 1311. Special Agent Varga testified that tweet records confirmed all posts from the @kriss182 account occurred on September 25, 2018. 6/2/25 Tr. 95:15–98:19. The tweet records also showed the posts were made in French and referenced ISIS official media and ISIS military activities. 6/2/25 Tr. 96:13–98:18; GX 1311. Special Agent Varga testified that tweets posted in French were "very similar" to a French language note from Defendant's white iPhone. 6/2/25 Tr. 98:23; GX 404 (Row 11).

Records obtained from Microsoft showed that the kris_878@hotmail.com email address was created on September 20, 2018, at 3:01 p.m. and was associated with the name "Bad Sad." 6/2/25 Tr. 90:2–91:4; GX 1313B; GX 1312. The FBI also obtained multiple emails sent to the kris_878 email address, including one from Outlook on September 20, 2018, at 10:02 a.m. with the English subject line "Welcome to your new Outlook.com account." 6/2/25 Tr. 91:12–16; GX 1313I. The body of the email read in part, "Hi, Bad. Welcome to your new Outlook.com account." 6/2/25 Tr. 91:19. The kris_878 email address then received an email from Twitter on September 20, 2018, at 10:04 a.m. with the subject line "Password reset request," and a link to reset the password for the @Kriss182 Twitter account. 6/2/25 Tr. 91:23–92:7; GX 1313H. Twitter sent another email at 10:06 a.m. with the subject "Your Twitter password has been changed." GX 1313H. The body of the email read in part: "Hi Kristin Annais, you recently changed the password associated with your account @Kriss182." 6/2/25 Tr. 92:11–24; GX 1313E.

From September 24 to September 25, Twitter sent four emails to kris_878@hotmail.com. All these emails were written in Arabic and had the subject line "New login to Twitter from Safari on iPhone." 6/2/25 Tr. 93:15–96:5. Each email indicated a new login to the @kriss182 from "Safari on iPhone," located in "Warsaw, Poland." 6/2/25 Tr. 93:24–94:13; 6/2/25 Tr. 96:6–7; GX 1313D.[7] Finally, on September 25, 2018, the kris_878 received an email in Arabic with the subject line "Your Twitter account has been suspended," and the body of the email provided in part: "Your account, Kriss182, has been suspended for violating Twitter rules." 6/2/25 Tr. 105:9–25; GX 1313C. Special Agent Varga testified that records received from Twitter confirmed the @kriss182 account was suspended on September 25, 2018. 6/2/25 Tr. 106:1–5; GX 1311.

The FBI also recovered numerous screenshots of the @Kriss182 Twitter account's posts on Defendant's white iPhone. GX 414. Special Agent Varga testified that the screenshots matched the content shown in the tweet records for the @kriss182 account. 6/2/25 Tr. 99:2–103:15; GX 1311. As with the other hacked accounts, the screenshots recovered from Defendant's phone were taken within seconds of the @kriss182 account posting the tweet. GX 414. Some of the tweets were posted in French, and Special Agent Varga again observed that several of these tweets, like some of the tweets from the @alfredo account (GX 413) appeared to be "the same" or copied and pasted from a French language note in Defendant's white iPhone, including the emojis. 6/2/25 Tr. 103:16–104:4; GX 404 (Row 12).[8] Further,

---

[7] When testifying about this exhibit, Special Agent Varga reiterated that the note in GX 404 Row 11 was modified on September 25, 2018, the same day of the email in GX 1313D, and listed "VPN: Poland" next to the account information for @kriss182.

[8] When testifying about this exhibit, Special Agent Varga added that the French language note in Row 12 of GX 404 was create and last modified on September 25, 2018, the same dates that the @kriss182 account made all its posts. 6/2/25 Tr. 104:5–11.

41

Special Agent Varga determined there were several matches between the accounts the @kriss182 account would tag and reply to on Twitter, and the list of Twitter accounts found in a different note on Defendant's phone. 6/2/25 Tr. 104:15–25; GX 404 (Row 30).

### D. Twitter Account D: @Mana

Row 7 of GX 404 contained a grouping of information corresponding to another Twitter account, with this note listing the Hotmail address "habiba_ali1@hotmail.com," the Twitter handle "@Mana83917608," a password, and VPN information. 6/2/25 Tr. 107:1–14. This note was created on October 5, 2018, and last modified on October 7, 2018. 6/2/25 Tr. 110:5–6; GX 404.

The FBI obtained search warrants for both the Hotmail and Twitter account listed in the note. 6/2/25 Tr. 107:17. According to the records obtained from Twitter, the @Mana account was associated with the "habiba_ali1@hotmail.com" email address, was first created on May 23, 2015, and was last modified on October 24, 2018. 6/2/25 Tr. 107:21–4; GX 1321. Tweet records showed that the @Mana account only posted tweets between the dates of September 25, 2018, and October 7, 2018. 6/2/25 Tr.111:10–112:2; GX 1321. The tweets themselves were predominately posted in Arabic and all contained pro-ISIS content. *Id.*

The FBI recovered screenshots of tweets posted by the @Mana account from Defendant's white iPhone. GX 415. 6/2/25 Tr. 113:20–23. Consistent with the tweet records, the posts seen in the images contained pro-ISIS content, including an infographic displaying ISIS media. GX 415; 6/2/25 Tr. 112:18–113:2. In his testimony, Special Agent Varga observed that one of the screenshots showed a tweet posted by the @Mana account on October 7, 2018, that replied to two other Twitter accounts. 6/2/25 Tr. 112:11–20. The tweet records for the @Mana account confirmed the account posted October 7, 2018, and that the tweet replied to the same two Twitter accounts seen in the screenshot. 6/2/25 Tr. 112:9–20; GX 1321.

Records obtained from Microsoft showed that the habiba_ali1@hotmail.com account was created on September 25, 2018, and was associated with the name "jebdhdueh djhdbddh." 6/2/25 Tr. 108:8–21; GX 1322. The FBI obtained several emails sent to the habiba_ali1 email address, and one of these emails was sent from Twitter on September 25, 2018, at 12:56 p.m. with the subject line "password reset request." 6/2/25 Tr. 108:22–109:4; GX 1323C. The body of this email read in part "If you requested a password reset for @Mana, click the button below." 6/2/25 Tr. 109:6–9. Twitter sent another email at 1:22 p.m. with the subject line "Confirm your Twitter account, Mana." GX 1323E. The body of the email provided in part: "Confirm your email address to complete your Twitter account @Mana83917608." 6/2/25 Tr. 109:10–20; GX 1323E. On September 27, 2018, at 5:31 p.m., Microsoft sent an email to the

habiba_ali1 address with the subject line "Congrats! Your Microsoft account is waiting." 6/2/25 Tr. 109:21–110:1; GX 1323F.

On October 7, 2018, at 1:48 a.m., Twitter sent another email to the habiba_ali1 email address with the subject line "Security alert: new or unusual login," and noted in the body of the email, "Just to be safe, we may ask you some security questions the next time you sign into your account @Mana83917608." 6/2/25 Tr. 9–19; GX1323D. Twitter sent a second email at the exact same time with the subject line "New login to Twitter for iPhone," with the body of the email reading in part, "We noticed a recent login for your account @Mana83917608," listing the device as "iPhone" and the login location as "Moscow, Russia." 6/2/25 Tr. 110:20–111:9; GX 1323G. Special Agent Varga testified that records obtained from Twitter confirmed that the @Mana account was suspended on October 24, 2018. 6/2/25 Tr. 114:2–7; GX 1321. Lastly, that the browser history data of Defendant's white iPhone showed that the device accessed the @Mana Twitter account on October 7, 2018. 6/3/25 Tr. 15:3–11 (GX 404A, Rows 10055–56).

## E. Other Accounts

Special Agent Varga further testified about other Twitter account information found on Defendant's devices, indicating he used the same account-hacking technique on other occasions. 6/2/25 Tr. 115:14. For example, the note contained in Row 10 of GX 404 listed Twitter account information for the handle @AZOoo_oz, including the email AZOoo_oz@hotmail.com, along with the text "number of followers: 905." 6/2/25 Tr. 106:10–22; GX 404. The note was created and modified on September 25, 2018. 6/2/25 Tr. 106:25.

The FBI obtained records from Twitter and Microsoft pertaining to both accounts. 6/2/25 Tr. 115:8–10. According to the records obtained from Twitter, the @AZOoo_oz account was created in 2014 and updated in 2018. GX 1351. Records obtained from Microsoft showed that the AZOoo_oz@hotmail.com email address received an email in Arabic from Twitter on September 25, 2018, at 6:30 a.m. with the subject "Password reset request." 6/2/25 Tr. 116:16–24; GX 1352D. At 6:31 a.m., Twitter sent another email in Arabic with the subject line "Confirm your Twitter account at Abd Al Azez." 6/2/25 Tr. 116:25–117:9; GX 1352E. Then, at 5:33 p.m., Twitter sent another email with the subject line "Security warning: new or unknown Twitter login." 6/2/25 Tr. 116:3–13; GX 1352C.

Additionally, the browser history from Defendant's white iPhone showed that the device accessed the @AZOoo_oz Twitter account on September 25, 2018. 6/3/25 Tr. 14:7–17; GX 404A (Rows 10033–34).

Turning back to Row 7 of GX 404, Special Agent Varga testified about another grouping of Twitter account information. This grouping listed an "email of

43

loma238@Hotmail.com, a username of loveSC1157, a password, and a VPN country of Germany." 6/2/25 Tr. 117:19–20. The FBI obtained records for these accounts as well. 6/2/25 Tr. 117:23. Records obtained from Twitter showed that the @loveSC1157 account was tied to the loma238@hotmail.com email address, was first created in 2014, and last updated September 30, 2018. 6/2/25 Tr. 118:2–9; GX 1361. Records obtained from Microsoft showed that the loma238 email address was created on September 30, 2018. 6/2/25 Tr. 118:14; GX 1363B. The FBI recovered several emails sent to loma238@hotmail.com, including emails from Twitter sent on September 30, 2018. The first email was a password reset request, followed by a "confirm your account" email for the @loveSC1157 Twitter account. 6/2/25 Tr. 118:19–119:8; GX 1363C; GX 1363D. Further, the browser history from Defendant's white iPhone confirmed that the device accessed the @loveSC1157 Twitter account on October 5, 2018. 6/3/25 Tr. 14:18–15:2; GX 404A (Row 10053).

The FBI also obtained records for the Twitter and Hotmail account information listed in the note contained in Row 4 of GX 404. 6/2/25 Tr. 119:9–21. The note displayed the following Twitter information: a Hotmail address "phangirltroll@hotmail.com," a Twitter handle, "@phangirltroll," and an ostensible password, along with "a note about 49 followers." 6/2/25 Tr. 119:11–20. Records obtained from Twitter showed that the account was first created in 2014 and last modified on July 3, 2019. 6/2/25 Tr. 119:25–120:4; GX 1371. Recovered emails sent to phangirltroll@hotmail.com showed that Twitter sent an email on October 8, 2018, with the subject line "New login to Twitter from iPhone." GX 1372B. The message indicated there had been a new login to the @phangirltroll Twitter account from Denmark. 6/2/25 Tr. 120:6–18; GX 1372B. Additionally, the browser history for Defendant's white iPhone indicated the device accessed the @phangirltroll Twitter account on October 8, 2018. 6/3/25 Tr. 16:2–7; GX 404A (Row 10063).

Another note in Defendant's phone listed the following Twitter account information: email address "rody231@hotmail.com," Twitter handle @RaGhad60, and the word "France." GX 404 (Row 26). The FBI again subpoenaed records for the accounts. 6/2/25 Tr. 120:21–24. Twitter records obtained for @RaGhad60 showed the account was created on July 26, 2011, and last modified on August 30, 2018, but did not list the same Hotmail email address seen in GX 404. 6/2/25 Tr. 121:11–17.

Special Agent Varga testified that the FBI unsuccessfully tried to identify the original owners of the Hotmail and Twitter accounts discussed in his testimony. 6/2/25 Tr. 218:2. But some of the account records did contain past photographs that were "personal in nature," showing that an actual person "had been using the account before." 6/2/25 Tr. 218:14–18. For example, records for the @phangirltroll showed activity such as posting photos, with one young white male with dark brown hair and distinctive tattoos and piercings seen in most of the images, and other activities like following other users, and replying to other posts. 6/2/25 Tr. 219:2–220:3; GX 1370. None of the images or posts contained ISIS flags, Khattab Media Foundation logos,

44

or any other terrorist content. 6/2/25 Tr. 220:9–16. Similarly, records obtained for the @RaGhad60 account showed personal images, including a selfie from Facebook, a group of unidentified young people, a screenshot of a school schedule, a photo of unidentified males, and a photo of a child. 6/2/25 Tr. 221:9–222:13; GX 1390. None of the images contained ISIS, Khattab, or any terrorist-related material. 6/2/25 Tr. 222:14–22.

### (11)     Western Union Evidence

Finally, Special Agent Varga testified concerning evidence related to certain Western Union transactions Defendant conducted. Special Agent Varga identified GX 1500 as an Associated Currency Exchanges receipt recovered from the search of the Defendant's residence. 6/2/25 Tr. 129:9–23. The document was dated August 27, 2018, at 10:31 p.m. and listed the sender as "Omar Al-Salman," the receiver as "Zaid," and the address of the sending currency exchange as 201 North Clark Street. 6/2/25 Tr. 130:9–15. Special Agent Varga noted that the name Zaid appeared in notes found on both Defendant's iPhones. 6/2/25 Tr. 130:17. The receipt listed the amount sent as $400, with an extra $8.99 paid in fees, and indicated that the sender paid $420 in cash. 6/2/25 Tr. 130:20–131:2.

Special Agent Varga identified GX 1600 as the records the FBI obtained from Western Union, which contained the same information as the receipt in GX 1500. 6/2/25 Tr. 131:24–133:8. He also identified GX 1700 as JP Morgan Chase bank records the FBI obtained for an account under the name Ashraf M Al Safoo, with the address 5225 North Virginia Avenue Floor 2 Chicago IL 60625. 6/2/25 Tr. 137:4–22. The second page of the exhibit recorded a $400 ATM withdrawal on August 28, 2017, and listed the following information in the description of the transaction: "8-27, 6155 Northwestern Avenue, Chicago, Illinois, card 5909." 6/2/25 Tr. 138:3–139:9.

With aid of the maps in GX 1501, GX 1502, GX 1503, and GX 1504, Special Agent Varga testified that the ATM location described on the Chase records was between Defendant's address on Virginia Avenue and the currency exchange on Clark Street, with the total drive between Defendant's residence and the currency exchange lasting approximately ten minutes. 6/2/25 Tr. 141:4–146:3.

Special Agent Varga testified that the transaction was wired to a Western Union facility in Sulaymaniyah city in northeastern Iraq and acknowledged that, based on the map in GX 3100, the location was outside of ISIS territory. 6/2/25 Tr. 193:19–194:7.

### x. Tyler Treml

The Government next called Tyler Treml. Treml received a bachelor's degree in communication studies from Temple University in 2014. 6/3/25 Tr. 19:22–25. At

the time of his testimony, Treml was employed as a senior analyst at SITE, "a private intelligence firm that uses human-based open-source methods to track, archive and analyze" foreign terrorist organization "and extremist propaganda online." 6/3/25 Tr. 20:10–12. Treml began working at SITE in August of 2016 and maintained supervisory responsibilities over a team of collectors and translators creating analysis reports. 6/3/25 Tr. 23:8–11.

Treml testified that SITE does not use classified material or widespread algorithmic scraping; rather, SITE uses "human experts" to track and analyze data obtained from terrorist and extremist propaganda obtained from public material available on the Internet. 6/3/25 Tr. 20:15–25. SITE's clients tend to be either governmental and law enforcement entities, or corporate entities. 6/3/25 Tr. 21:15–17. SITE's two main products are similarly divided into two buckets. The first is "the descriptive analysis side," where SITE provides "analysis reports, dispatches," and where analysts "contextualize and analyze the data." 6/3/25 Tr. 21:22–25. The second is "the raw data side," where SITE houses the "material in a proprietary database." 6/3/25 Tr. 22:1–3.

Treml testified that most of his "core duties" for the past nine years entailed looking at ISIS and Al-Qaeda media "on a day-to-day basis," specifically looking at content, locations of distribution, spread and dissemination, and feedback loops. 6/3/25 Tr. 23:23–24:12. As part of his work, Treml reviews both official ISIS media organizations and unofficial organizations. 6/3/25 Tr. 24:20–23. At the time of his testimony, Treml had served as an expert witness on prior occasions and once in a trial setting. 6/3/25 Tr. 25:9–12.

The Government offered Treml as an expert in ISIS media content and distribution under Rule 702, without objection. The Court accepted Treml as an expert witness and he then testified credibly on the following subjects.

Treml testified that he reviewed the documents contained in the Government's "1100 series" of exhibits. 6/3/25 Tr. 26:2–4. Utilizing demonstrative GX 1113, Treml testified that from 2017 to 2019, ISIS media infrastructure was divided into multiple primary categories. 6/3/25 Tr. 28:18–20. The first category constituted ISIS official media, including its official foundations and "wilayat" or province-level media organizations. 6/3/25 Tr. 28:21–23; 29:15–21. The second category comprised "sets" of ISIS-linked "media units" divided into "function" specific groups. 6/3/25 Tr. 28:24–25. The first set was the "distribution" units, which primarily republished news from ISIS official sources along with other media and performed a similar role to the official news agency. 6/3/25 Tr. 30:9–14. The next set included the "inciting and packaging ISIS rhetoric into propaganda" units. 6/3/25 Tr. 30:18–20. These groups were "known for incitement" and created threat posters and videos, as well as working on what was "originally ISIS material into new visuals and audiovisual packages." 6/3/25 Tr. 30:18–22. Treml testified that Khattab was one of these

46

organizations, along with several others not pictured in the demonstrative exhibit, such as Sunni Shield.  6/3/25 Tr. 30:24–31:2.

The final three sets included the (1) "hacking and tech group" units, who were known "to be a collection of units that were defacing websites" and "issuing what are known as kill lists," (2) the "social media units," which were units "dedicated to the distribution of hashtags and tips on how to as widely distribute the media across social media channels," and (3) the "link generating channels" such as Knights of the Uploading. 6/3/25 Tr. 31:12–32:6.  Treml testified that this final set was "foundational to the operation" overall because those units "generated dozens of links for a given media release" and the links "would be hosted on what would be otherwise innocuous websites like archive.org," increasing the reach of ISIS "media before it could be taken down in other locations."  6/3/25 Tr. 32:8–13.

In the 2017–2019 timeframe, there were several especially prominent foundations that fell "under an umbrella known as Intaj Al-Ansar," and these groups were "the most prominent propaganda packaging units linked to The Islamic State." 6/3/25 Tr. 33:25–34:6.  The Al-Ansar groups would generate a wide variety of multimedia content often "aimed at inciting and threatening attacks globally, particularly in the West," and would participate in "coordinated threat campaigns launched for a particular world event or upcoming event" in addition to making content outside of campaigns. 6/3/25 Tr. 34:8–25.  Khattab media foundation was one of these prominent foundations and published "threat content" supportive of ISIS in a variety of media forms.  6/3/25 Tr. 36:2–18.  Khattab would publish this material on Telegram, and where it was then ultimately distributed to various social media platforms.  6/3/25 Tr. 36:23–25.

Treml identified the following Government exhibits as Khattab media products SITE found on publicly available Internet websites.  Treml identified GX 1102 as a document containing Khattab media SITE recovered from a website called RocketChat, which began serving as "a place for" ISIS in December 2018.  6/3/25 Tr. 37:7–11.  Treml identified GX 1103 as a video (which contained the "Our Gifts Our Ready" message) issued by Khattab on December 25, 2017, that was initially published on Telegram. 6/3/25 Tr. 37:12–38:3. Treml identified GX 1104 as a video issued on October 4, 2017, just a few days after the Mandalay Bay shooting in Las Vegas, for which ISIS claimed responsibility.  6/3/25 Tr. 38:12–14.  Treml identified GX 1105 as a video issued by Khattab issued on February 14, 2018 "threatening upcoming elections in Egypt."  6/3/25 Tr. 41:13–25.

Treml also testified that he found evidence of Khattab's participation in multiple campaigns between 2017 and 2019, adding a campaign is not "a subtle event; nor is it mean to be."  6/3/25 Tr. 39:8–9.  Treml testified that Khattab took part in the "Breaking the Idols" campaign and identified certain portions of GX 1100 and 1101 as Khattab's contributions to the campaign.  6/3/25 Tr. 41:3–4.  Treml also testified

that Khattab participated in the "Renewal of the Bayah" campaign launched on April 2, 2018, where all ISIS-linked units used identical templates and messages to reinstate their pledge to the caliph," and identified GX 1106 as containing Khattab's contributions to that campaign. 6/3/25 Tr. 42:15–43:4.

Treml further testified regarding the Al-Wafa foundation. On November 25, 2017, Al-Wafa announced they were merging with Khattab, but on December 9, 2017, Khattab announced the cancellation of the merger. 6/3/25 Tr. 44:18–21. Treml testified that the leader of Al-Wafa, Mohamed Mahmoud, was "embroiled in an ideological dispute with ISIS religious officials" and launched a "spin-off" of Al-Wafa called Al-Taraf and, "without permission from ISIS central media, posted a series of religious clarifications" regarding the dispute. 6/3/25 Tr. 44:23–45:11. Because of this disagreement, ISIS imprisoned Mahmoud (and he was eventually killed in an airstrike while still in prison). 6/3/25 Tr. 45:13–15. Treml identified GX 1109 as showing Khattab's announcement cancelling the merger with Al-Wafa. 6/3/2025 Tr. 46:4–5.

Treml testified that in his work with SITE he learned of the arrest of Ashraf Al-Safoo and, in the days after the arrest, Khattab issued a threat infographic against the then-head of the FBI office in Chicago Jeffrey Sallet, shown in GX 1107T. 6/3/25 Tr. 46:6–47:6.

### xi. Special Agent Brianna Winter

The Government's last witness was Special Agent Brianna Winter. Special Agent Winter testified that she relocated to Los Angeles but previously had multiple professional roles with the FBI in Chicago from 2015 through 2022. 6/3/25 Tr. 57:13–58:2. One of her roles was a staff operations specialist assigned to CT6, the same counterterrorism squad where Special Agent Varga was assigned. 6/3/25 Tr. 59:4–12. Special Agent Winter testified that she was assigned to do "one task" related to the investigation of Ashraf Al-Safoo. 6/3/25 Tr. 58:13–19. Special Agent Winter provided the following credible testimony regarding her work on the case.

Special Agent Winter testified that in the summer of 2018, she was asked to go through Khattab Telegram communications, curate URLs shared in the chats, and capture "whatever content they link[ed] to, whether that was a video, an article," or "other media." 6/3/25 Tr. 58:24–59:2. She did not use legal process but instead only placed the URLs in a public search engine to see where the links connected. 6/3/25 Tr. 65:19–23. Special Agent Winter then created a spreadsheet of her findings, indicating what URLs she found, where in the chats she found them, whether the URLs were active, what content they led to, the file names of captured content, and the exhibit number matching with the file captured. 6/3/25 Tr. 59:5–61:13; GX 1200.

48

Special Agent Winter testified about numerous examples of Khattab Media Foundation material she found through the URLs posted in the Khattab general members Telegram group. *See* GX 200. One example was the link shown on page 449 of GX 200, which displayed a banner showing ISIS fighters and the Khattab logo attached to the ISIS flag, along with a justpaste.it URL, "Archive" URL and other website URLs linking to an article. Special Agent Winter testified all of URLs in the post led to publicly accessible websites in open source materials. 6/3/25 Tr. 65:9–66:6. Special Agent Winter added that the "Archive" link led to a "file-sharing service that captures historical information from the web" and allows content to remain available on the Archive site, even if it was deleted in other places. 6/3/25 Tr. 65:11–15. Using the Archive link, Special Agent Winter found an Archive webpage showing the same image banner from the exhibit, displaying the Khattab Media Foundation logo and the ISIS flag, along with the article itself. 6/3/25 Tr. 66:7–67:5. The title of the linked article was "Divine Covenant for the Adherents to the Bond of Faith, by Abu Al'-Abbas Al-Iraqi." 6/3/25 Tr. 67:20–21.

Special Agent Winter testified that she found other articles written by Defendant through the URLs in the Khattab general group, including those shown in GX 1209 (with the URL from page 941 of GX 200), GX 1207 (with the URL from page 887 of GX 200), and GX 1205 (with the URL from page 517 of GX 200). 6/3/25 Tr. 68:2–70:4; 6/3/25 Tr. 72:18–74:10; 6/3/25 Tr. 74:11–76:6. She also found other articles, including an issue of Al-Naba from a justpaste.it URL found on page 1299 of GX 200. 6/3/25 Tr. 76:17–78:24. Another example included an article found from a URL on page 1685 of GX 200, which led to an article by "Klashin Yemeni" titled "Baghdad of the Caliphate," and stated in part "You will not enjoy your living or your sleep, no matter how much you try to lie in order to delude yourselves with your alleged security. You will wake up to nightmares of explosive belts, booby-traps, silencers, and explosive devices." 6/3/25 Tr. 85:2–87:24; GX 1219.

Special Agent Winter also found numerous Khattab videos on the Internet from the URLs in the Khattab Telegram groups, including the Brothers in Marawi video produced in GX 1206B, which Special Agent Winter found through the DropBox URL from page 544 of GX 200. 6/3/25 Tr. 70:9–72:10. Other publicly available Khattab videos included ones depicting violence, fighting, and explosions, as shown in GX 1203B (found through a link on page 370 of GX 200), GX 1219B (found through a link on page 1694 of GX 200). 6/3/25 Tr. 79:2–85:1.

Special Agent Winter added that her testimony pertained to only a representative sample of the other articles and videos she found, and that she found the items in multiple spots on the Internet. 6/3/25 Tr. 88:8–16.

49

### xii. Stipulations

The Government also moved in three stipulations concerning the accuracy of Turkish, Spanish, and French translations of certain Government exhibits and the admissibility of certain exhibits. All of the listed exhibits in each stipulation were moved into evidence without objection. 6/2/25 6/3/25 Tr. 44:10–45:25.

### b. Defense Case

The defense did not call any witnesses at trial.

Instead, the defense case consisted of Stipulation Four, which provided that a cooperating human source (CHS) in this case, if called to testify, would state that as of February 3, 2020, he/she was familiar with the name and profile picture of Maqdisi Baghdadi from an unidentified social media platform, and that this name was later changed to Al-Zubayr in 2015 or 2016. 6/3/25 Tr. 91:16–25. The stipulation also stated that the CHS said Al Zubayr was smart and wanted to attack the government, not people, and was initially against ISIS but then started to support ISIS after ISIS freed prisoners in Mosul Iraq. 6/3/25 Tr. 92:14–18. The stipulation added that the CHS said the chat group started out with Sunnis who were against Shias, then shifted to become in favor of ISIS. The CHS knew Al-Zubayr created an ISIS video that included the Khattab Media foundation logo. 6/3/25 Tr. 92:23–24. Al Zubayr took a video previously created by ISIS and added songs, graphics, and put the Khattab logo on it. 6/3/25 Tr. 92:23–93:1. According to the CHS, Al Zubayr wanted the chat room to grow and would encourage members to edit videos, but never asked anyone for money or to join ISIS, nor did the CHS believe Al Zubayr had any legitimate ISIS connections himself, but rather just did "his own thing to support ISIS." 6/3/25 Tr. 93:2–13. The CHS also did not believe that ISIS reached to Al Zubayr to tell him "Hey, create this or do that." 6/3/25 Tr. 93:14–15. Further, the CHS also said that he/she viewed Al Zubayr's Khattab Media Foundation videos on YouTube and knew the name of Al Zubayr's channel was Khattab Media Foundation, and he sometimes went by the name Khattab and created the foundation from that name. 6/3/25 Tr. 93:7–9.

### III. Findings of Fact and Conclusions of Law

The Court now turns to its findings of fact and conclusions of law. As the Court already stated with respect to each witness above, the Court has found that the witnesses presented at trial provided credible and reliable testimony.[9]

---

[9] The Seventh Circuit has stated that a trial court's witness credibility determinations "can virtually never be clear error" because the court "had the opportunity to listen to testimony and observe the demeanor of the witness." *United States v. Stewart*, 536 F.3d 714, 720 (7th Cir. 2008) (quotations omitted).

Before discussing each Count in the Second Superseding Indictment, the Court notes two items that apply to its analysis overall. First, the Government admitted GX 1400 into evidence, which is a screenshot of the Federal Register confirming ISIS's formal recognition as a designated terrorist organization on May 7, 2014 and subsequent renewal for the relevant dates here. This exhibit was admitted without objection and the Court notes that the exhibit establishes that ISIS qualified as an FTO for purposes of all § 2339B Counts in this case.

Second, the Court recognizes that the parties jointly submitted some legal instructions for the Court's convenience in advance of trial. Courts, including the Seventh Circuit itself, "presume that the Pattern Criminal Jury Instructions for the Seventh Circuit correctly state the law." *U.S. v. Marr*, 760 F.3d 733, 744 (7th Cir. 2014) (citation omitted). In this case, the Court reviewed the applicable Pattern Instructions here, the underlying statutes and case law for each Pattern Instruction, and the parties' uncontested submissions. Based on this review, the Court finds no cause to depart from the Pattern Instructions for the elements in this case and relies upon the applicable Pattern Instructions for the basic elements of each charge, without objection.

### a. Count One

The Court begins with Count One, which charged Defendant with conspiracy to provide material support or resources, namely, services, to ISIS, knowing that ISIS was an FTO engaging in terrorist activity, in violation of 18 U.S.C. § 2339B(a)(1). A conspiracy under § 2339B does not require proof of an overt act, and thus the government need only show the existence of a conspiracy to provide material support, namely services, and that the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy.

§ 2339B defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (one or more individuals who may be or include oneself), and transportation, except medicine or religious materials." § 2339B(g)(4); § 2339A(b)(1). Importantly, § 2339B does not require a defendant to have the specific intent to further an FTO's terrorist activities; rather, § 2339B only requires a defendant's knowledge of the organization's connection to terrorism. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 16–17 (2010); Committee Comment, SEVENTH CIRCUIT PATTERN JURY INST. at 974, 979 (§ 2339B).

The Court also notes that the Pattern Instructions for § 2339B require that the Government prove one of the following requirements: (1) the defendant is a national or permanent resident alien of United States; or (2) the defendant is a stateless

51

person with habitual residence in the United States; or (3) after the charged conduct occurred, the defendant was brought into or found in the United States; or (4) the offense occurred in whole or in part in the United States; or (5) the offense occurred in or affected interstate or foreign commerce; or (6) the defendant aided or abetted or conspired with any person over whom jurisdiction exists. PATTERN INST. at 975–76. The evidence at trial showed Defendant immigrated to the United States and resided in Chicago, Illinois during the time of the offense, and was arrested in Chicago on October 17, 2018. Further, no evidence suggested that Defendant ever left the United States during the time of the offenses charged. Therefore, the evidence satisfied this required element beyond a reasonable doubt.[10]

Turning to the other elements of Count One: here the Government presented overwhelming evidence of the existence of Khattab Media Foundation, its goals, and its terrorist activities. The goals of the organization were simple: (1) disseminate official ISIS messaging and propaganda on the Internet through spreading ISIS official media and participating in official media campaigns; (2) create pro-ISIS material and spread that material to inspire potential followers and incite terror in ISIS's enemies, on behalf and in support of ISIS; and (3) hack into various social media accounts to further spread ISIS propaganda.

The overwhelming evidence presented at trial showed this conspiracy was ongoing, coordinated, and highly structured. Khattab had dozens of members, as shown in the Telegram groups in the Government's 100 and 200 exhibit series. The organization had its own logo, which was often interchanged with or attached to the ISIS flag in its infographics, articles, and videos. And Khattab had an organized structure, as confirmed by the testimony of Mothafar and as seen in the Telegram groups. The organization divided itself into specialized subgroups, including a writer's group, graphic design group, and others. The most explicit evidence came in GX 8019, an organizational chart found on Khalid Abuzulaikha's devices, who Special Agent Varga testified was a key leader in Khattab operating under the username "Wahhad," among other aliases. The chart showed delegated roll assignments and a coordinated workflow plan in support of the ISIS campaigns, which Khattab participated in by producing media and by engaging in Twitter raids to disseminate the ISIS material. 5/30/25 Tr. 144:18–145:25; GX 260.

The evidence demonstrated that Khattab's internal organization and activities were part of a cohesive, recognized structure of unofficial media foundations actively supporting ISIS and working under its direction. As expert witness Dr. Levitt testified, ISIS viewed media as extremely important to its organization and mission for three main reasons: (1) to propagate their extremist ideology; (2) to defend their movement against global counternarratives denouncing the organization; and (3) to inflict fear in their enemies, which was an extensive list including, but not limited to, all Shia Muslims, Westerners, and those ISIS deemed to be practicing Islam

---

[10] The Court incorporates by reference this factual finding for all other § 2339B Counts in this case.

insufficiently. Dr. Levitt added that because ISIS was also establishing a new caliphate, and wanted to broadcast the idea that "any good Muslim" needed to "somehow support the caliphate," they needed to push the idea that ISIS members and supporters were "the true Muslims" and should be followed and adhered to, a goal that "was incredibly important and could not be done by battlefield victories alone." 5/27/25 Tr 79:9–22. To accomplish this, ISIS took media to an "entirely new, extremely organized," and "polished level with multiple types of media," (5/27/25 Tr. 78:22–23), supported by a broad network of official media organizations dedicated to specific types of content, such a news agency and radio agency, in addition to "province" level media organizations, all controlled by a central media committee.

But these numerous official media organizations were not enough. Mothafar testified that ISIS members could not be online "24/7" and needed a broader reach of both manpower and internet connectivity. To meet that need, ISIS was also supported by a broad network of "unofficial" foundations that served ISIS by propagating their messaging, as confirmed by the testimony of both Dr. Levitt and Tyler Treml. As ISIS media emir Yasir Al-Aniz described, ISIS relied on its network of unofficial foundations to bolster its reach, spread its propaganda, and incite terror on a global level.

Tyler Treml estimated around 30 such unofficial organizations existed, (Mothafar estimated around 20), and they were divided into those that provided a wide range of media products, and others that focused on discrete services, such as link generation in the case of Knights of the Uploading. As confirmed by Treml's testimony, Khattab was one of those unofficial foundations and maintained a prominent place within the ISIS network. Khattab existed exclusively to serve ISIS's media needs and directions, as shown in Defendant's own words, including from his reposts from his personal Telegram channel on the Khattab general members Telegram group, captured in GX 312. In the post, advertising position opportunities within Khattab, Defendant stated that the post served "to confirm the foundation's continuous support to The Islamic State and in response and following the command of our Sheikhs and leaders of the state, and to anger the infidels and hypocrites in confrontation of them so they know that the state has supporters that don't get tired or bored." GX 312.

In Dr. Levitt's words, ISIS "made it clear" that the content "going to the outside," or beyond their territory was only in their "purview," i.e., the purview of ISIS central media. 5/27/25 Tr. 79:3–5. And the evidence showed they did, in fact, maintain that direction and control over the unofficial, supporter foundations. Mothafar testified that he participated in the Abu-Hamza Telegram group with other unofficial foundation leaders and would receive direct instructions from ISIS members about official media campaigns, and that information would get disseminated to the other unofficial foundations. Furthermore, per the common practice, when he wanted to redesign an official ISIS image for publication, he

53

specifically asked someone he knew to be an ISIS member, Abu Ammar, whether it was "allowed or not," because it "was not a normal republication." 5/28/25 Tr. 58:17–59:11. Defendant himself also emphasized that supporter foundations took directions from ISIS on content, and the evidence included specific examples of him discussing this dynamic. *See* GX 237 (Defendant replying to one Khattab member who claimed that a certain video was "official" that the video "wasn't issued by the State Media, but it appears that the Media Office urged on releasing it," because "the brothers" at Knights of the Uploading "released it" and that organization took "guidance" from ISIS).

Likewise, ISIS also disciplined supporter foundations that departed from its approved messaging. Yasir Al-Anzi, again a convicted ISIS member and former ISIS media emir, testified that ISIS would give warnings about certain groups and tell its supporters not to listen to certain unauthorized groups. This testimony was corroborated by the Al-Wafa episode. As described in the testimony of Special Agent Varga, Tyler Treml, and as seen in the documentary evidence, Al-Wafa became embroiled in a theological dispute with ISIS leadership and was "excommunicated" from the larger organization. ISIS leadership jailed Al-Wafa's leader, and as Mothafar confirmed, ISIS released a "pronouncement" that the foundations were no longer allowed to listen to or publish any of Al-Wafa's content. Khattab itself heeded ISIS's commands, cancelling their planned merger with Al-Wafa and releasing statements online claiming that they "raised the matter of the foundation with our brothers and leaders in the caliphate state Council" and "gladly announce our return to our places and our departure from the ongoing conflict" happening "among the supporters." GX 889. Soon after this release, Defendant himself posted in the Khattab writer's Telegram group about the aborted merger, stating in part that they should "let the foundation return to where it was, working under the direction of the Office." GX 103.

As already discussed, ISIS also directed unofficial foundations to participate in coordinated media campaigns. The trial evidence contained extensive evidence and testimony about the operation of these concerted campaigns, and Defendant's personal involvement in them. ISIS would approve a particular topic, often centered around a world event, and a list of approved hashtags for supporter foundations to use. Per Mothafar's testimony, ISIS members would release this content to a group of especially trusted supporter foundation members, who would then disseminate that information to the other supporter foundations, and those groups would in turn would launch a coordinated effort to create and release the approved material in support of the campaign. GX 327 and GX 214 provided just two examples of Defendant's posts and reposts of materials related to such campaigns, with the latter exhibit containing a message from Defendant stating that Khattab had to release material because "All the foundations made releases." Defendant and other Khattab members would push other members to contribute to the campaigns, shown in GX 114, where Defendant tells Khattab writers they can create "just something simple"

54

so Khattab can "contribute" to "the campaign to support our brothers in Baghdad." GX 114.

Khattab participated in a multitude of campaigns and produced extensive work-product for the purpose of spreading ISIS's chosen message on the Internet. As illustrations of Khattab's participation in such campaigns, GX 1104, GX 118, GX 214, and GX 313 showed examples of Khattab work product and discussions concerning the "Las Vegas raid" campaign after ISIS claimed responsibility for that mass shooting. GX 1100, GX 1101, GX 1111, GX 1112, GX 109, GX 245, GX 258, and GX 285 similarly showed Khattab's work-product and discussions advancing the "Breaking the Idol" campaign. Further, Defendant, and other members, consistently encouraged other Khattab members to not be "lazy" and instead work harder on behalf of the ISIS campaigns. GX 395.

Both ISIS and its supporters (including Defendant) viewed this work as instrumental to ISIS's terrorist cause. Dr. Levitt testified that ISIS viewed its media supporters as just as important as its fighters, and Khattab members consistently described themselves as fighting a "media war." One Khattab member put it bluntly: "If the military war is aimed to control lands, the media war is aimed to control the mind. The Islamic State understood the situation and created a comprehensive council . . . ." GX 277. Defendant personally echoed these sentiments in posts within the Khattab writer's Telegram group. For example, in urging Khattab writers to produce more articles, Defendant wrote that "the state mobilized us to migrate, but we did not migrate" and instead "they are mobilizing us for media support." GX 117. Khattab members accordingly believed their participation was important and celebrated when their work product was recognized on the Internet. Two examples of this conduct include GX 287, where Defendant wrote that Khattab was "raising their blood pressure" and posted a link to a media website discussing Khattab's "Las Vegas" raid and "Our gifts are ready" propaganda materials, and GX 301, where Abu Huthafa similarly reposted a SITE analysis of Khattab's infographics threatening the 2018 World Cup.

Khattab also produced its own propaganda to serve ISIS, echoing official messaging and amplifying the organization's activities. Explicitly, Khattab assured its followers that the "Khattab foundation adheres to what is issued by the official and does not contradict it at all." GX 844. All evidence produced at trial corroborated this statement. The record contained a multitude of other examples of Khattab producing similar media (some of which the Court discusses in more detail in analyzing Count Two), and the FBI found hundreds of these Khattab media items on Defendant's phones, and devices, as well as the devices of Khalid Abuzulaikha. The volume of evidence alone speaks to the dedication and prolific nature of the

Defendant's and Khattab's ISIS activities, all of which were in favor of, and celebrated, ISIS's mission and promoted its terrorist threats and acts of violence.[11]

There was also voluminous evidence that Khattab members actively disseminated ISIS media, their own supporting products, and ISIS campaign-driven products on the Internet through Twitter raids, Internet uploads, and social media posts. As Special Agent Winter testified, many of Khattab's infographics and other media could be found on publicly accessible websites over the Internet. Further, Khattab members would consistently tag infographics and other media on Telegram with messages like "for dissemination," or "for posting," as shown in GX 216, among other exhibits.

As proven at trial, Khattab members, including Defendant, routinely discussed spreading pro-ISIS material beyond Telegram, emphasizing how keeping their content on Telegram would not sufficiently further their mission, and in turn, ISIS's mission. Defendant succinctly expressed this sentiment in a July 22, 2018 post to the Khattab general members group, writing "For the millionth time, we reiterate that there is no support on Telegram because it is a closed world exclusive for the supporters. The news did not reach common Muslims. He who thinks is a supporter and is fixated on Telegram only, let him think twice." GX 302. Defendant, along with other members, echoed these messages beyond just Telegram posts. In an article produced in GX 113, Defendant tells readers to "Rise up, defend and support your brothers and don't allow an opportunity to pass you by. Break into Facebook, invade Twitter, and disseminate on YouTube. Don't leave a country that Allah would like to see you at without showing Allah what pleases him." GX 113.

Khattab members responded to Defendant's calls to action. As the Court will discuss more in later Counts, Khattab members went on numerous unlawful "Twitter raids" and exploited social media to spread official ISIS media and their own pro-ISIS messaging. They did this, by their own words, to support "the state," and viewed themselves as advancing ISIS's cause and goals with each post, in the same manner as the ISIS combatants in the Middle East. Again, as the Court will discuss further in later Counts, Defendant participated in these activities, including posting an ISIS video on YouTube himself that promoted graphic video depictions of decapitations and other violence. *See* GX 209; GX 619; GX 622.

In short, Khattab's sole purpose was to provide approved media services to ISIS. Defendant described the relationship clearly in a post on Telegram, writing that the state was "mobilizing us for media support." GX 117. ISIS viewed its media supporters as critical to its operations, and members of the unofficial foundations,

---

[11] As just one example, in GX 275 and GX 276, Khattab took ISIS official news (about invading a prison to release some of its captured fighters) and created infographics to amplify ISIS's actions. Again, this one example shows a single instance of Khattab's support for ISIS; the evidence produced at trial offered an overwhelming number of other episodes.

including Khattab, understood their important role within ISIS's overall mission. Khattab members knew, and constantly discussed, how important ISIS viewed media in amplifying and disseminating their messages and described themselves as fighters in a "media war" in support of ISIS. And Khattab actively provided those critical media support services, generating media products that were violent, threatening, and prolific, as shown by the extensive evidence at trial.

Without question, these services constituted material support for terrorism, as shown by the co-conspirator's own articulation of the importance of their work to ISIS. ISIS wanted, needed, and actively sought and directed the unofficial foundation's media support. Those unofficial foundations, including Khattab and Defendant himself, understood that importance, actively sought to fill that need, and pushed each other internally within Khattab to spend more time and resources serving ISIS's media requirements and demands. Further, the exhibits and testimony, even beyond what the Court has already discussed, showed that Khattab viewed itself as, in Defendant's own words, as "working under the direction of the Office," or ISIS central media, and only produced content approved by ISIS. GX 103. The clear existence of the organization, the clear and singularity of its purpose, the clear material value of those services to ISIS, and members' consistent knowledge and discussion of its purpose to support ISIS, proves the existence of a conspiracy to violate § 2339B beyond a reasonable doubt.

Further, Defendant not only knowingly participated in this organization—he was a prominent leader within it, as proven through both how others described him within Khattab and Defendant's own words when issuing direction to other writers. *See* GX 108; GX 113; GX 115; GX 245. In Telegram, Defendant operated under multiple alias usernames, including Abu Al-Abbas Al-Iraqi, Abbusi, and Abu Shanab, all of which were tied to him beyond a reasonable doubt, incuding by his self-identification as Abu Al-Abbas Al-Iraqi in the voice memo in GX 411, the voluminous Khattab materials and Telegram contacts and chats recovered from his devices, and the cookies linking his jamesfoley870 email to his other personal devices. Additionally, Abu Al-Abbas Al-Iraqi self-identified as Abu Shanab in GX 326 and Abussi in GX 227 and GX 275. Under these aliases, both the OCE and Special Agent Varga identified Defendant as the leader of the Khattab writer's division, and the campaign organizational chart in GX 8019 and Defendant's own words providing direction and instructions to the Writer's group confirmed that testimony.

Defendant took his leadership role seriously, constantly providing instructions to other writers and Khattab members in support of the ISIS mission. In the voice memo in GX 411, Defendant stated that he "defended" Khattab as if it "belonged to me," describing himself as "taking ownership." In addition to serving as a leader, Defendant also personally contributed to Khattab's prolific media product, writing numerous articles that were disseminated and made publicly accessible on the Internet, as confirmed by the testimony of Special Agent Winter. And again, as the

Court will discuss further, Defendant actively engaged in posting preapproved, pro-ISIS messages and other ISIS official media on Twitter, and he encouraged other Khattab members to do the same.

Finally, there is no reasonable doubt that Defendant knew ISIS was a terrorist organization. In his personal devices, Defendant possessed staggering volumes of terrorist propaganda, including videos of extreme and grotesque violence, on his personal devices and email account. He personally celebrated and encouraged the dissemination of videos depicting executions and brutality perpetrated by ISIS. He told other Khattab members to "spread fear" and "spread terror" as directed by ISIS in his posts on Telegram, including promoting videos about the Las Vegas mass shooting as "raising" the "blood pressure" of society. GX 211, GX 218, GX 287. Showing his conscience of guilt, Defendant also took extensive steps to utilize operational security trade-craft in an attempt to evade law enforcement detection, as confirmed by the testimony of the OCE. This included messaging with the OCE about the covert nature of VPNs and posting on Telegram about using VPNs to avoid detection, as well as refusing to disclose his location to the OCE when asked, and employing multiple VPN applications on the phone he used for spreading ISIS material. All this evidence, and the other evidence produced at trial, proves beyond a reasonable doubt that Defendant knew ISIS was a terrorist organization, celebrated its activities, and further provided his services to the organization to assist in those activities.

The Court adds that Defendant's activities were not independent advocacy, or otherwise protected speech. As the Supreme Court made clear in *HLP,* and the Seventh Circuit echoed in *United States v. Osadzinksi,* 97 F.4th 484 (7th Cir. 2024), expressive activity may be constitutionally limited when the support is addressed to, directed by, or coordinated with a foreign terrorist organization. Khattab Media Foundation existed, by its members' own words (including Defendant's own admissions), to do just that: provide critical media services to ISIS at ISIS's approval and direction, strictly adhering and complying with ISIS's messaging and directives. This is exactly the type of material support through intangible services §2339B prohibits.

Simply put, the evidence overwhelmingly proved the existence of a conspiracy, and Defendant's knowing participation within that conspiracy, that is, an unlawful agreement to provide material support to the terrorist organization known as ISIS. Accordingly, the Court finds Defendant guilty on Count One.

### b. Count Two

Count Two of the Second Superseding Indictment charged Defendant with conspiracy under 18 U.S.C. § 371 to send threats in violation of 18 U.S.C.875(c). To "prove a conspiracy under § 371, the government" must "establish a joint commitment

58

to an 'endeavor which, if completed, would satisfy all of the elements of the underlying substantive criminal offense." *United States v. Clark*, Nos. 24-1320, 24-1321, 2025 WL 1635508, *11 (7th Cir. Jun. 10, 2025). Here, the Government also needed to prove an overt act occurred in furtherance of the conspiracy on or after November 15, 2013. *U.S. v. Griggs,* 569 F.3d 341 (7th Cir. 2009). To prove a substantive violation of 18 U.S.C. § 875(c), in turn, the government must prove: (1) the defendant knowingly transmitted a communication; (2) the communication contained a true threat to injure any person; (3) the defendant transmitted the communication for the purpose of making a threat or knowing the communication would be viewed as a threat; and (4) the communication was transmitted in interstate or foreign commerce.

Under well-settled law, a "true threat" is defined in the Seventh Circuit Pattern Instructions as:

> "[A] serious expression of intent to commit unlawful physical violence against another person or a group of people. The communication must be one that a reasonable observer, considering the context and circumstances of the statement, including surrounding communications, would interpret as a true threat.

> The government does not have to prove that the defendant actually intended to carry out the threat, or even that the defendant had the capacity to do so. At the same time lack of intent or lack of capacity to carry out the threat can be relevant circumstances in deciding whether a communication is a true threat.

> A threat does not need to be communicated directly to its intended victim, or specify a particular victim, or specify when it will be carried out.

> A communication is not a true threat if it is merely idle or careless talk, exaggeration, or something said in a joking manner.

> A threat may be conditional, that is, may threaten violence if some condition is not fulfilled. The fact that a communication is conditional, however, can be relevant in deciding whether a communication is a true threat.

PATTERN INST. at 333. *See also Elonis v. United States,* 575 U.S. 723 (2015).

The Government presented overwhelming evidence of the existence of the conspiracy charged in Count Two, and Defendant's active participation in it. For example, as detailed in Special Agent Varga's testimony, and as seen in the evidence obtained from Defendant's devices, Khattab Media Foundation made hundreds, if not thousands, of videos and infographics spreading ISIS propaganda, many of which contained true threats as defined by law. To point to just a few examples, GX 1100

59

depicts an animated image of the 9/11 attacks, with text below reading "Our upcoming terror will make you forget what you saw in New Yoek [*sic*] and Washington raids!"  GX 845 shows an image of an ISIS fighter standing in London surrounded by burning embers and contains text that reads in part "we will turn your infidel holidays into massacres."  GX 418 shows an image of an ISIS fighter looking over a burning city and reads in part "We will water the earth with your blood. Prepare your coffins.  And dig your graves."  GX 1104 contains a video released by Khattab celebrating the Las Vegas mass shooting with text on the screen reading in part "We promise you that the coming is more disasters [*sic*]."

The law does not require a defendant to possess the ability or intent to carry out the threat, nor specify a particular victim or time for the threat.  Rather, the government must prove the elements noted above, including that the defendant possessed the intention to make the threat, i.e., make the communication itself, and that the communication must have content that a reasonable observer would interpret as a threat.  *See* PATTERN INST. at 333.  Here, the evidence easily met all of the requisite elements of the offense.  The illustrative examples noted above constitute only a small subset of the hundreds of threats and threat material made by Khattab, and they are indictive of the active language Khattab would use, such as "our *upcoming* terror" or "we *will*" turn holidays "into massacres."  These were active terms accompanied by violent and at times grotesque imagery, leaving no reasonable doubt as to either their sender's intent or a reasonable viewer's interpretation.[12]

These threats were also actively disseminated publicly on the Internet, as Defendant himself acknowledged and celebrated.  Khattab's "Our Gifts Are Ready" video, admitted in GX 1103, presents one example.  The video depicts a bomb planted in a Christmas present under a Christmas tree, then shows a crowd gathered around the tree, with a fighter standing behind them holding a detonator.  The video next displays flashes of several Western cities, then shows the fighter detonating the bomb, covering the screen in flames. GX 1103. Any reasonable observer would clearly interpret this video as a threat to Westerners and other individuals observing Christmas.[13]  On May 27, 2018, Defendant reposted a link from a media website discussing the video and celebrated the public reaction, commenting "we are raising their blood pressure."  GX 287.  Likewise, the "Our Gifts Are Ready" video threat was also discussed on Twitter, shown by the screenshot of a December 25, 2017 tweet recovered from Khalid Abuzulaikha's devices.  GX 824.

---

[12] Communications between Khattab members, including Defendant, further confirms the nature of the threats.  For example, in GX 211, Defendant, writing under the username Abu Shanab, encouraged Khattab members to post "to cause confusion and spread terror within the hearts of those who disbelieved," adding "we must spread fear among them, brothers."

[13] This analysis of the threatening nature of the video is bolstered by the fact that both the tweet in GX 824 and the article linked in GX 287 specifically refer to the video itself as a "threat" to Christmas posted by a "pro-ISIS" group.

To be clear, Count Two does not charge a substantive violation of § 875(c), only a conspiracy to violate the statute. Thus, the Government did not need to prove any actual true threats were made in interstate commerce, but rather only an agreement to do so. The overt acts discussed above (which were, in fact, true threats), however, do show both Defendant and his co-conspirators' clear participation in the unlawful agreement.

The Court also incorporates its factual findings regarding the function and organization of Khattab, and Defendant's participation within it, discussed in Count One. Khattab worked as a cohesive, coordinated organization and actively created pro-ISIS material containing true threats for the purpose of providing material support to ISIS's terrorist activities. Members encouraged and celebrated the spread of that material to as many viewers as possible, and they did, in fact, cause that material to be disseminated on the Internet.

Given the evidence at trial, including evidence of Defendant's active participation in the Khattab organization and his personal encouragement of the dissemination of true threats over the Internet, the Government produced overwhelming evidence to prove the elements of Count Two beyond a reasonable doubt. Accordingly, the Court finds Defendant guilty on Count Two.

### c. Count Three

Count Three charged Defendant with conspiracy under 18 U.S.C. § 371 to intentionally access a protected computer used in interstate commerce and thereby obtain information from a protected computer in violation of § 1030(a)(2) and (c)(2)(B)(ii). The Court incorporates its previous statements regarding the legal standard for § 371.[14] The elements of the underlying substantive offense, in turn, are as follows: (1) the defendant intentionally accessed a computer without authorization; and (2) by accessing the computer the defendant obtained information from any protected computer. If these two elements are proved beyond a reasonable doubt, then the Court must also determine if the offense was committed in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or of any State. 18 U.S.C. § 1030(c)(2)(B)(ii).

A "computer" under § 1030 (and as defined in the Pattern Instructions) is "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions." 18 U.S.C. § 1030(e)(1). The term "includes any data storage facility or communications facility directly related to or operating in conjunction with such device," but "does not include an automated typewriter or typesetter, a portable handheld calculator, or other similar

---

[14] This Court also notes here that it granted the June 2 unopposed oral motion to correct the scrivener's error in Count Three, which lists § 1030(c)(2)(B)(iii) where the correct statute is § 1030(c)(2)(B)(ii). The Court only considers the orally corrected version here.

device." *Id.* A "protected computer" is a computer that is either: (1) "exclusively for the use of a financial institution or the United States government;" (2) "not exclusively for the use of, used by or for a financial institution or the United States government when the defendant's conduct affects the use of the computer by or for the financial institution or the government;" or (3) "used in or affecting interstate or foreign commerce or communication, even if the computer is located outside of the United States." PATTERN INST. at 578; 18 U.S.C. § 1030(e)(2).

Here, the Government produced extensive evidence showing that Khattab members, including Defendant, engaged in Twitter "raids" where they would hack into existing Twitter accounts and unlawfully co-opt them to post ISIS media until Twitter suspended the account.

As an initial matter, the trial evidence proved that the Twitter's servers qualify as "protected computers" under the statute. Former Twitter vice president of global affairs Nicholas Pickles testified that Twitter collected certain information for a user to create an account, including their username, email, password, and phone number. Pickles testified that only the username and the person's tweets, or posts, were publicly accessible. The rest of that data, or "subscriber information," was private and not publicly accessible. Once a user logged into their account, however, their own private information was visible to them within their profile. Pickles testified that Twitter stored subscriber information within the company's servers, all of which were connected to the Internet and housed in various data centers, and the subscriber information was only visible to the individual user itself and a small number of authorized Twitter employees. Twitter did not have any servers or data centers in the state of Illinois from 2017 through 2018.

Twitter's servers accordingly qualify as a "computer" under § 1030 because, among other things, the definition of "computer" includes "any data storage facility" under the statute, and Pickles testified the servers performed that function. Further, Pickles testified that the servers were connected to the Internet, and none existed in the state of Illinois. This easily satisfies the requirement that the computers were "used in" interstate commerce. Although the Seventh Circuit has declined to recognize use of the Internet alone as enough to establish the "in interstate commerce" element in another context (*see United States v. Haas*, 37 F.4th 1256, 1263 (7th Cir. 2022) (discussing § 875(c)), here, the evidence also showed that Defendant lived in the state of Illinois, accessed Twitter repeatedly from his white iPhone, and no evidence showed that he ever left the state of Illinois during the time of the offense. Thus, Defendant's Illinois-based access of Twitter's servers, which were themselves located outside the state of Illinois, satisfies the "interstate commerce" element for purposes of defining Twitter's servers as a "protected computer."

The Court also incorporates here its prior analysis of Count One, including the evidence that ISIS viewed media support as critical to its overall mission, how

Khattab organized its activities around serving ISIS in that capacity, and how it actively aided and supported ISIS through spreading ISIS media material as widely as possible, including via Khattab's "Twitter raids." As noted above, Pickles testified that in the 2017 to 2018 timeframe, terrorist and extremist content constituted one of Twitter's most pressing issues, if not the most pressing issue. Twitter had to suspend "hundreds of thousands" of accounts for posting this type of material and Twitter remained in communication with various governments about how to limit the spread of terrorist propaganda on the platform. The trial evidence further showed that Khattab members were some of the many perpetrators infecting Twitter's platform with extremist and violent content.

As explained by Microsoft representative Alan Filush, and as seen in the videos found within Khattab's Telegram groups and on Defendant's own devices, Khattab members exploited a known vulnerability in Hotmail by using recycled Hotmail addresses to hack into Twitter accounts connected to those old emails. Specifically, Khattab members obtained vulnerable Hotmail addresses, created a new Microsoft account with the reused Hotmail address (using a VPN to conceal themselves), and then sent password reset links from the previous user's connected Twitter account to the new inbox, utilizing the recycled email address. After receiving the password reset, the Khattab hackers then reset the password and gained unlawful access to the Twitter account, subsequently locking out the previous user and gaining access to the private subscriber information within the account. Khattab members then used these "seized" Twitter accounts to post ISIS propaganda until Twitter ultimately suspended the account. The evidence produced at trial showed that Khattab members frequently engaged in these Twitter raids and messaged constantly about the value of posting ISIS propaganda via Twitter, because of its extensive reach, and often discussed methods to keep the hacked accounts open for longer. *See* GX 202; GX 219; GX 260; GX 302. Khattab members also encouraged one another to learn these hacking techniques and to participate in the raids.[15]

As already discussed, Khattab members also planned such raids in conjunction with ISIS campaigns. Khattab members viewed these raids as a significant aspect of their support for ISIS campaigns, describing their plan to "invade Twitter and Facebook" as a plan to "direct the battalions and publishers towards Twitter to target the accounts" of "tyrants and their scholars." GX 327.

The evidence further showed that Defendant agreed to, and participated in, these activities, including (among other things) explicitly asking for a seized Twitter

---

[15] In GX 308, for example, Wahhad reposted an invitation to a training session on what was termed the "methods of support." In other messages, different Khattab members posted links to videos with instructions on how to seize Twitter accounts via these hacking raids. GX 260; GX 317. Khattab members also discussed how hacking into Twitter accounts was better than creating new ones because "it will last longer" and encouraged other members to seize accounts, emphasizing that it will take "one minute only" to take over an existing account. GX 260.

account in the Khattab members Telegram group (GX 293), storing a video on his personal computer with step-by-step instructions on how to hack into Twitter accounts (GX 710), storing notes about hacking into Twitter on his phone (GX 404), reposting messages on Telegram telling Khattab members to "set Twitter ablaze" (GX 218) and telling members "We must spread fear among them, brothers. Access their media pages" (GX 211) and writing articles encouraging ISIS supporters to "invade Twitter." GX 113.

Further, the Government proved beyond a reasonable doubt that Defendant did, in fact, hack into multiple Twitter accounts and used them to post ISIS material, which the Court discusses with respect to Counts Four through Eleven below. Among other things, the evidence proved that Defendant kept VPN applications and the Outlook application installed on his white iPhone, consistent with the technique described in the hacking how-to videos. *See* GX 406. The Government also presented Defendant's saved screenshots of his Twitter raid posts and his browser history extraction, both of which confirmed that Defendant unlawfully accessed multiple Twitter accounts and stored those accounts' information in the Notes application of his white iPhone, such as the @AZOooz account and other accounts underlying the substantive charges.

In sum, the Government presented evidence beyond a reasonable doubt that the conspiracy charged in Count Three existed, Defendant participated in the conspiracy, and overt acts were taken by Defendant and other conspirators in furtherance of the conspiracy.[16] Further, because the Twitter raids were conducted as part of Khattab's ongoing support services to ISIS, as the Court described in Count One, the Court finds that the conspiracy agreement also included an agreement to commit the § 1030 offense in furtherance of a violation of the laws of the United States, specifically § 2339B(a)(1).

Accordingly, the Court finds Defendant guilty on Count Three.

### d. Counts Four and Five

Per the parties' characterization at trial, the Second Superseding Indictment charged Counts Four through Eleven in four "pairs," centering around four specific Twitter hacking events, with the even Counts charging violations of 18 U.S.C. § 1030(a)(2)(C), and the odd Counts charging violations of 18 U.S.C. § 2339B. The Court discusses those Counts in the same paired structure below.

---

[16] The Second Superseding Indictment lists the hacking offenses, charged substantively in Counts Four, Six, Eight, and Ten, as overt acts in the Count Three conspiracy, and thus the Court incorporates its findings on those Counts into its findings for Count Three, because Defendant's hacking activities both prove his knowing participation in the conspiracy and also constitute overt acts taken in furtherance of the conspiracy.

The Court incorporates its previous discussion of the substantive elements of § 1030(a)(2)(C), § 1030(c)(2)(B)(ii), and § 2339B to its analysis in Counts Four through Eleven. The Court also incorporates by reference its prior findings regarding Khattab Media Foundation's material support to ISIS through media services, including "Twitter raids," and Defendant's knowledge of, participation with, and active leadership role in Khattab's activities, as stated in Counts One, Two, and Three.

In Count Four, the Second Superseding Indictment charges Defendant under § 1030(a)(2)(C) and § 1030(c)(2)(B)(ii), alleging on or about September 16, 2018, Defendant intentionally accessed a protected computer in interstate or foreign commerce without authorization, and thereby obtained information from a protected computer through Twitter Account A (the @neniiz account), and committed the offense in furtherance of a criminal act in violation of the laws of the United States, specifically § 2339B.

In Count Five, the Second Superseding Indictment charges Defendant under § 2339B, alleging that on or about and between September 16 and 17, 2018, Defendant knowingly provided and attempted to provide material support and resources, namely services, to ISIS through Twitter Account A.

At trial, the Government proved beyond a reasonable doubt that the Defendant accessed the @neniiz account through the ISIS hacking method displayed in the videos found on his computer and in the Khattab Telegram groups.[17] As previously

---

[17]Among other things, the trial evidence showed that Defendant stored a note on his white iPhone containing the following information: "email: gori_627@hotmail.com; username: @neniiz627; password: zxc123; vpn: United States." GX 404 (Row 26). The note was both created and last modified on September 17, 2018. Records obtained from Microsoft showed that the gori_627 Hotmail address was created on September 16, 2018, and registered to a name "uef jgdg." GX 1333K; GX 1332. Records obtained from Twitter also showed that the @neniiz627 account was created on November 19, 2010, and last updated on September 19, 2018, and that it was associated with the gori_627@hotmail.com email address, and utilized an IP address geographically tied to Mexico. GX 1331. Those records also showed that the account's screenname was changed from @neniiz627 to @neniiz628 on September 16, 2018, and that the account was suspended on September 19, 2018. GX 1331. The gori_627 email address received multiple emails within a two-minute span on September 16, 2018. The first was a "Welcome to your new account" email from Outlook.com written in Arabic and addressed to "Uef." GX 1333C. One minute later, Twitter sent an email in Spanish containing a password reset link for the Twitter account "@neniiz627." GX 1333I. Within sixty seconds of that email, gori_627@hotmail.com received another email in Spanish from Twitter with the subject line "Confirm your Twitter account, Erika B'm." GX 1333A. The body of the message read in part: "confirm your electronic email address to complete your Twitter account at neniiz627." GX 1333A. The next day, September 17, 2018, Twitter sent an email in Arabic addressed to "Erika B'm," with the subject line: "Your Twitter account has been reactivated." GX 1333H. Special Agent Varga also testified that tweet records obtained for the @neniiz account showed its only posts all occurred on September 17, 2018. The tweets often featured Arabic language and centered around two predominate themes. The first theme centered on official ISIS media and a specific date in the Islamic calendar (Monday, Muharram 7, 1440). The second theme referenced certain media outlets, a video release, and the text "jihad continues till the judgment day."

discussed, those videos instructed hackers how to takeover Hotmail accounts from recycled email addresses, and infiltrate Twitter accounts linked to those addresses to post ISIS media. Here, Defendant possessed login information for the @neniiz account in his Notes application, created and modified the note in the same short time frame that the account engaged in its only Twitter posting activities, and the account posted numerous ISIS-related posts during that spurt of activity. Further, records from Microsoft and Twitter confirmed that the Twitter account was created eight years before its associated Hotmail account came into existence, and its password was changed on the same day the Hotmail account was activated, substantiating Defendant's use of the hacking method.

The Court's conclusion finds further support in the fact that the FBI recovered several screenshots of the @neniiz account's posts on Defendant's white iPhone, shown in GX 416. Many of the images indicate that the screenshot was taken two seconds, four seconds, or two minutes after the post had been made, corroborating that it was Defendant himself who made the post. Put another way, it is entirely implausible that Defendant could consistently screenshot the posts of a hacked Twitter account within seconds of that account posting material and not have control of the account. Additionally, the screenshots show the account posted ISIS propaganda in those tight windows, corroborating the tweet records and providing further evidence that it was Defendant who controlled the account and made those posts as part of a "Twitter raid" supporting ISIS. Finally, the browser history of Defendant's white iPhone also confirmed that he accessed the @neniiz Twitter account on September 17, 2018, the same day that its only recorded Twitter activity occurred. GX 404A (Rows 10057–58).

Taken together, this evidence proves beyond a reasonable doubt that Defendant infiltrated the @neniiz Twitter account. Further, once Defendant accessed the Twitter account, he obtained access to the private subscriber information that Nicholas Pickles testified was stored on Twitter's servers and not publicly available, including the email address and phone number associated with the account. And, as the Court previously explained, Twitter's servers were protected computers and therefore Defendant's unauthorized access into those servers and access to that private subscriber information satisfies the elements of § 1030(a)(2)(C).

The Court also finds that the Government provided beyond a reasonable doubt that Defendant committed this act in furtherance of a violation of § 2339B, as screenshots from Defendant's own device show that he used the account to post and spread ISIS propaganda. Defendant's conduct clearly displayed his engagement in a "Twitter raid" in the manner he discussed with other Khattab members and in concurrence with his own articles encouraging other ISIS supporters to "invade Twitter" to spread ISIS's messaging. Defendant's conduct in personally participating in "Twitter raid" activity provided those important media services, and thus material support to ISIS, through his misuse of the @neniiz account.

Therefore, the evidence satisfies the elements of the § 2339B charge in Count Five and the elements of the § 1030(c)(2)(B)(ii) charge in Count Four. The Court accordingly finds Defendant guilty on Counts Four and Five.

### e. Counts Six and Seven

In Count Six, the Second Superseding Indictment charges Defendant under § 1030(a)(2)(C) and § 1030(c)(2)(B)(ii), alleging between on or around September 17, 2018 and on or about September 19, 2018, Defendant intentionally accessed a protected computer in interstate or foreign commerce without authorization and thereby obtained information from a protected computer through Twitter Account B, the @alfredo79917667 account, and committed the offense in furtherance of a criminal act in violation of the laws of the United States, specifically § 2339B.

In Count Seven, the Second Superseding Indictment charges Defendant under § 2339B, alleging that on or about and between September 17 and 19, 2018, Defendant knowingly provided and attempted to provide material support and resources, namely services, to ISIS through Twitter Account B.

At trial, the Government proved beyond a reasonable doubt that the Defendant accessed the @alfredo account in a manner consistent with the conduct the Court discussed in Counts Three, Four, and Five.[18] Defendant possessed login information for the @alfredo account in his Notes application, created and modified the note in the same time frame that the account engaged in its only Twitter posting activities, and the account posted numerous ISIS-related posts during that short spurt of

---

[18] Among other things, the evidence showed Defendant kept a note on his iPhone with the following information: "email: gori_399@hotmail.com; username: @alfredo79917667; password: zxc123; vpn: America." GX 404 (Row 20). The note was created on September 18, and last modified on September 24, 2018. Records obtained from Microsoft showed that the gori_399 Hotmail address was created on September 16, 2018 in the United States (Notably, the very same VPN location listed in Defendant's note containing the @alfredo account information), and it was associated with the name "jd jrje." GX 1302. Twitter records indicated the @alfredo account was first created on April 30, 2012, and updated on September 19, 2018, was associated with the gori_399 Hotmail address, and was suspended on September 19, 2018. GX 1301. Further, tweet records for the @alfredo account showed it only posted on September 18 and 19, 2018, and all of the posts referred to ISIS fighters, "apostate" groups fighting ISIS, or ISIS official media. The Government also presented multiple emails the gori_399@hotmail.com account received from September 16 through September 19. The first was an email from Outlook on September 16, 2018, which read in part "Welcome, jd. Welcome to your new account in Outlook.com." GX 1303F. The same day, the gori_399 email address received an email from Twitter in Spanish containing a password reset link for the @alfredo account. GX 1303E. Five minutes later, Twitter sent another email in Spanish with the subject line "Confirm your account, Alfredo." GX 1303G. On September 17, 2018 and September 18, 2018, Twitter sent two emails providing security alerts for the @alfredo account due to a new or unusual user session. GX 1303H; GX 1303I. On September 19, 2018, Twitter sent an email addressed to "Alfredo" indicating the @alfredo account was suspended for failing to comply with Twitter terms. GX 1303D.

activity. Further, the @alfredo Twitter account came into existence six years before its associated email address was created, and had its password changed on the same day the Hotmail email address was created, corroborating use of the previously discussed Twitter hacking method.

Other evidence corroborated Defendant's misuse of the @alfredo account. The FBI recovered a multitude of screenshots of the @alfredo account's posts on Defendant's white iPhone. GX 413. Like Defendant's activity with the @neniiz account, many of the screenshots were taken one second, two seconds, or ten seconds after the @alfredo account posted.[19] The screenshot images also show that the account posted ISIS propaganda, corroborating the tweet records. Further, the extraction report of the browser history of Defendant's white iPhone revealed that he accessed the @alfredo on September 18 and September 20, that is, within the timeframe of the account's short window of activity. GX 404A (Rows 10029–32).

This evidence proves beyond a reasonable doubt that Defendant accessed the account, pursuant to a "Twitter raid" in support of ISIS. The Court also incorporates here its prior comments from Counts Four and Five regarding the nature of Defendant's access to private information once he obtained unauthorized access to the Twitter account, and Twitter's servers' status as protected computers. Therefore, because the Government proved beyond a reasonable doubt that Defendant gained unauthorized access into the @alfredo account, and thus, he unlawfully obtained unauthorized access into Twitter's protected computers and access to private subscriber information. In short, the trial evidence satisfies the elements of § 1030(a)(2)(C) charged in Count Six.

The Court also finds that the Government provided beyond a reasonable doubt that Defendant committed this act in furtherance of a violation of § 2339B. The screenshots from Defendant's own device show that he used the @alfredo account to post and spread ISIS propaganda, consistent with the "Twitter raid" activities Khattab engaged in to provide material support to ISIS. Because Defendant's conduct regarding the @alfredo account provided these same services, and thus material support to ISIS, as previously discussed in Counts One and Three through Five, the evidence satisfies the elements of the § 2339B charge in Count Seven and the elements of the § 1030(c)(2)(B)(ii) charge in Count Six.

The Court finds Defendant guilty on Counts Six and Seven.

---

[19] Once again, it remains entirely implausible that Defendant could consistently take screenshots of the posts of a hacked Twitter account within seconds of an ISIS post occurring and not have control of the account.

### f. Counts Eight and Nine

In Count Eight, the Second Superseding Indictment charges Defendant under § 1030(a)(2)(C) and § 1030(c)(2)(B)(ii), alleging on or about September 20, 2018, Defendant intentionally accessed a protected computer in interstate or foreign commerce without authorization and thereby obtained information from a protected computer through Twitter Account C, the @kriss182 account, and committed the offense in furtherance of a criminal act in violation of the laws of the United States, specifically § 2339B.

In Count Nine, the Second Superseding Indictment charges Defendant under § 2339B, alleging that on or about and between September 20 and 25, 2018, Defendant knowingly provided and attempted to provide material support and resources, namely services, to ISIS through Twitter Account C.

Once again, the trial evidence proved beyond a reasonable doubt that Defendant accessed the account in a manner consistent with the hacking technique utilized in Counts Four through Seven.[20] Like with the other Twitter accounts discussed, the FBI again found multiple screenshots on Defendant's white iPhone of posts made by the hacked @kriss182 Twitter account. The images showed multiple French language posts from the @kriss182 account of pro-ISIS material, corroborating the account's tweet records. Further, consistent with the other hacked accounts, several of the screenshots were taken within one second, six seconds, or

---

[20] At trial, the Government showed that, in the same note as the @alfredo account information, Defendant also had a second grouping of information that included an email, "kris_878@hotmail.com," a Twitter handle, "@kriss182," and a password and a line of text saying "VPN: Poland." Again, the note was created on September 18, 2018, and modified on September 24, 2018. This same account information was also seen in the note in Row 11 of GX 404, created and modified on September 25, 2018. 6/2/25 Tr. 87:24–89:5. Records from Twitter showed that the @kriss182 account was first created on September 24, 2009, and last modified on September 25, 2018, and it was associated with the kris_878@hotmail.com email address. GX 1311. Tweet records confirmed that all posts from the @kriss182 account occurred on September 25, 2018, were in posted in French, and referenced ISIS official media and ISIS military activities. GX 1311. Special Agent Varga observed that some of the French tweets corresponded to the French language text found in the Row 11 note. Tr. 98:23; GX 404. Twitter records also showed the account was suspended on September 25, 2018. GX 1311. Likewise, Microsoft records showed that the kris_878@hotmail.com email address was created on September 20, 2018, and was associated with the name "Bad Sad." GX 1313B; GX 1312. On September 20, 2018, the kris_878 email received a "Welcome to your new Outlook.com account" in English, with the body of the email reading in part "Hi, Bad. Welcome to your new Outlook.com account." GX 1313I. Two minutes later, the kris_878 address received a password reset email from Twitter for the @kriss182 account. GX 1313H. Two minutes after that email, Twitter sent another email addressed to "Kristin Annais" indicating the password for the @kriss182 account had changed. GX 1313E. Between September 24 and September 25, the kris_878 email address received four emails more from Twitter, all written in Arabic and containing the subject line "New login to Twitter from Safari on iPhone." GX 1313D. Each email indicated a new login session to the @kriss182 Twitter account in Warsaw, Poland from Safari on iPhone. Twitter sent a different email on September 25, 2018, this one indicating that the company suspended the @kriss182 account. GX 1313C.

69

eight seconds of the @kriss182 account posting the tweet. GX 414. Special Agent Varga testified that many of the Tweets, including the French text and emojis, appeared "copied and pasted" from the French language note in Defendant's white iPhone shown in Row 12 of GX 404. That note was created on September 24, 2018, and modified on September 25, 2018, aligning with the account's activity period. Defendant also maintained another note with a list of Twitter accounts on his white iPhone, seen in Row 30 in GX 404. Special Agent Varga determined there were several "matches" between the accounts the @kriss182 account would tag and reply to on Twitter, and the Twitter accounts listed in the note. Additionally, the @kriss182 account was created nine years before its associated Hotmail email address, had its password changed on the same day the kris_878@hotmail.com came into existence, and received multiple security warning emails about new login from Warsaw, Poland—the same VPN country location listed in the Row 11 note in Defendant's phone. Further, the note was last modified on September 25, the same day Twitter suspended the @kriss182 account.

Unlike those Counts, however, the Government did not present any evidence from Defendant's browser history showing that he accessed the @kriss182 account. But the absence of this specific type of evidence did not prevent the Government from meeting its burden on Counts Eight and Nine. The evidence at trial still showed Defendant retained specific account information for the @kriss182 account in his Notes application, created and modified the note during the tight timeframe the hacked account posted pro-ISIS material, and kept numerous near instantaneous screenshots of the account's pro-ISIS posts on his phone, and the account's French-language tweets appeared "copied and pasted" from a French-language note in Defendant's phone. Simply put, in light of this evidence, no reasonable inferences remain other than Defendant infiltrated the account and unlawfully used it to post pro-ISIS material.

As before, the Court incorporates its comments from Counts Four and Five regarding Defendant's access to private information once he obtained unauthorized access to the Twitter account and Twitter's servers' status as protected computers. Therefore, because the Government proved beyond a reasonable doubt that Defendant gained unauthorized access into the @kriss182 account, the Government met its burden with respect to the elements of § 1030(a)(2)(C) in Count Eight.

The Government also proved beyond a reasonable doubt that Defendant committed this act in furtherance of a violation of § 2339B, as screenshots from Defendant's own device show he used the account to post and spread ISIS propaganda. Relying on the factual findings in Counts One, Two, and Three the Court finds Defendant infiltrated this account pursuant to a "Twitter raid." As a result, his actions provided the same media services, and thus material support, to ISIS discussed in Counts One and Three through Seven.

70

The Government accordingly met its burden with respect to the elements of the § 2339B charge in Count Nine, and the elements of the § 1030(c)(2)(B)(ii) charge in Count Eight. As such, the Court therefore finds Defendant guilty on both Counts.

### g. Counts Ten and Eleven

In Count Ten, the Second Superseding Indictment charges Defendant under § 1030(a)(2)(C) and § 1030(c)(2)(B)(ii), alleging on or about September 25, 2018, Defendant intentionally accessed a protected computer in interstate or foreign commerce without authorization and thereby obtained information from a protected computer through Twitter Account D, the @Mana83917608 account, and committed the offense in furtherance of a criminal act in violation of the laws of the United States, specifically § 2339B.

In Count Eleven, the Second Superseding Indictment charges Defendant under § 2339B, alleging that on or about and between September 25 and October 7, 2018, Defendant knowingly provided and attempted to provide material support and resources, namely services, to ISIS through Twitter Account D.

Like in Counts Four through Nine, the Government established that the Defendant accessed the account pursuant to a "Twitter raid."[21] Defendant also possessed the login information for this account in the Notes application on his phone, created and modified that note in the same period the account engaged in its only Twitter posting activities, and the account posted numerous ISIS-related posts during that short spurt of activity, prior to its suspension.[22] This evidence is further

---

[21] As to these Counts, once again, the trial exhibits contain overwhelming evidence of guilt. For example, Row 7 of GX 404 contained a note in Defendant's white iPhone with another set of Twitter account information, this note listing the Hotmail address "habiba_ali1@hotmail.com" associated with the Twitter handle "@Mana83917608," along with password information. Records from Twitter showed the @Mana account was associated with the habiba_ali1@hotmail.com email address, was created on May 23, 2015, and was last modified on October 24, 2018. The account's tweet records showed it only posted tweets between the dates of September 25, 2018, and October 7, 2018. The tweets were predominately written in Arabic and contained pro-ISIS content. GX 1321. The same records also showed that the account was suspended on October 24, 2018. GX 1321. Likewise, records from Microsoft showed that the habiba_ali1@hotmail.com account was created on September 25, 2018 and was registered with the name "jebdhdueh djhdbddh." GX 1322. That same day, the habiba_ali1 email address received a password reset request for the @Mana account. GX 1323C. Minutes later, Twitter sent another email with the subject line "Confirm your Twitter account, Mana," and the body of the email provided in part, "Confirm your email address to complete your Twitter account @Mana83917608." GX 1323E. On October 7, 2025, Twitter sent two emails at the same time to the habiba_ali1 email address about the @Mana account. One had the subject line Security alert: new or unusual login," and the other subject line stated, "New login to Twitter for iPhone," identifying that the login occurred in Moscow, Russia through a Safari on iPhone browser. GX 1323D; GX 1323G.

[22] In this instance, the records from Twitter show the company did not suspend the @Mana account until October 24, 2018 (seven days after Defendant's arrest), and none of the other records for the account showed any other activity besides that event. GX 1321. In other words, even though

71

corroborated by the fact that Defendant once again kept screenshots of the @Mana account's posts on his phone. The FBI found two such images, one taken five seconds after the @Mana account posted a tweet and the other 3 seconds after a post. Special Agent Varga also testified that the tweets in the screenshots showed the @Mana account replied to two other Twitter accounts with an ISIS infographic. Even though no dates are visible in the images, the account's tweet records show that the @Mana account posted a Tweet on October 7, 2018, which replied to the same Twitter accounts seen tagged in the post shown in the screenshot. 6/2/25 Tr. 112:9–20; GX 1321. Likewise, the browser history from Defendant's white iPhone confirmed that his device accessed the @Mana Twitter account on that very same day. GX 404A (Rows 10055–56).

In sum, the evidence presented proves beyond a reasonable doubt that Defendant accessed the @Mana account pursuant to "Twitter raid" activity in the same manner as Counts Four through Nine. The Court also incorporates its comments from Counts Four and Five regarding Defendant's access to private information once he obtained unauthorized access to the Twitter account and Twitter's servers' status as protected computers. Therefore, because the Government proved beyond a reasonable doubt that Defendant gained unauthorized access into the @Mana account, and thus obtained unauthorized access into Twitter's protected computers and access to private subscriber information, the evidence satisfies the elements of § 1030(a)(2)(C) in Count Ten.

The Court also finds that the Government provided beyond a reasonable doubt that Defendant committed this conduct in furtherance of a violation of § 2339B, as screenshots from Defendant's own device show that he used the hacked account to post and spread ISIS propaganda. Relying on the prior findings in Counts One, Two, and Three, the Court finds Defendant infiltrated this account pursuant to a "Twitter raid" and his actions thus provided the same material support to ISIS discussed in Counts One and Three through Nine.

The Government accordingly met its burden with respect to the elements of the § 2339B charge in Count Eleven and the elements of the § 1030(c)(2)(B)(ii) charge in Count Ten and thus the Court finds Defendant guilty on both Counts.

---

Defendant unlawfully accessed this account prior to his arrest, Twitter did not suspend the account until a few weeks after his use of it. This conclusion finds further support in Nicholas Pickles' testimony that Twitter had to suspend "hundreds of thousands" of accounts for terrorist content from 2017–2018, and Twitter constantly had to police content on its platform to combat individuals like Defendant who evaded suspensions. Further, the evidence at trial showed examples of some Khattab members who claimed they managed to keep certain Twitter accounts open for prolonged periods of time, taking advantage of failures in Twitter's security features. Clearly, Twitter did not immediately catch every single offending account, and it would be unreasonable to assume they could do so with perfect accuracy. Based on the evidence presented at trial, the Court reasonably concludes that this is what occurred with respect to the @Mana account.

### h. Count Twelve

In Count Twelve, the Second Superseding Indictment charges Defendant with a § 2339B violation, alleging that on or about August 27, 2018, Defendant provided material services, namely money, to ISIS. The Court incorporates its previous statements regarding the elements of § 2339B.

As to this Count, the Government presented evidence showing that Defendant sent money through a Western Union transaction to Yasir Al-Aniz, an ISIS member who Defendant knew from another Telegram group. Al-Anzi recalled that Defendant sent him money more than once, but remembered no details other than on one occasion Defendant sent him $400. Al-Anzi testified that the topic of sending him money arose when they discussed the hard living conditions of the people in ISIS controlled Syria. Again Al-Aniz could not remember details but he recalled that he used money from Defendant to buy food for several families on one occasion, and medicine for another individual on a different occasion, and told Defendant he used the money for these purposes.

The Government's evidence certainly confirmed that a $400 transaction took place. The Government presented a receipt found in Defendant's house, Western Union records, and Defendant's bank account records, all of which confirmed that Defendant sent $400 to a currency exchange in Sulaymaniyah City in Kurdistan, located in northeastern Iraq, on August 27, 2018. Further, these records indicated that Defendant, using a false name, sent the $400 to someone named "Zaid." Al-Aniz testified that a Western Union employee gave him that name to use for the transaction with Defendant. GX 1500.

Despite this evidence, certain evidentiary gaps remained with respect to the § 2339B offense charged in Count Twelve. Specifically, although Al-Aniz was, in fact, an ISIS member and held a leadership role within the organization, the Government did not prove beyond a reasonable doubt that Defendant knew that fact. Instead, the evidence at trial showed Defendant met Al-Aniz through a Telegram group that existed primary to share news about ISIS activities, and this group was not limited to ISIS members. At trial, Al-Aniz testified that through their private messages and communications on the group chat, he became aware that Defendant was an ISIS supporter and resided in the United States, but he also testified that he did not recall if he told the Telegram group he lived in ISIS-controlled Syria, (although he thought it was "obvious" to the Telegram group that he resided in Syria, based on his discussions about the life and problems in Syria at the time). GX 2500 at 97:6-13.

Nevertheless, Al-Anzi failed to confirm which of these discussions Defendant may have seen, nor could Al-Anzi confirm if he ever personally informed Defendant that he was a member of ISIS's internal media. Instead, he only testified that it was "possible" he made his ISIS media role known to the group in an indirect way. GX

73

2500 at 97:17–22. The evidence at trial, including other parts of Al-Anzi's testimony, established that a significant difference existed between supporters of ISIS and members of ISIS, with the latter swearing "bayat," or an oath of allegiance, receiving a salary, and residing in ISIS territory. Supporters, on the other hand, still provided important services to ISIS, but did not have the same requirements or direct connection to the organization as members. As Al-Anzi testified, the Telegram group he participated in with Defendant existed to share information about ISIS and contained ISIS supporters, including Defendant who Al-Anzi knew to be a supporter. GX 2500 at 77–78. But Al-Anzi's equivocal testimony regarding whether he ever informed the Defendant of his membership status within ISIS cannot prove beyond a reasonable doubt that Defendant knew Al-Anzi was more than just a supporter, but rather an actual member of ISIS. In this way, this evidence differs from a case where a defendant sends funds to a known member of ISIS, because the facts here support multiple inferences, including one wherein the Defendant sent funds to someone Defendant believed was a mere supporter of the organization. That difference is also cast in sharper relief where, as here, the stated reasons for sending the funds were unrelated to ISIS.

Certainly, as the Government stated in its rebuttal arguments, "membership alone" in a terrorist organization "isn't make or break" for Count Twelve. The critical factor is "whether the money is going to ISIS." 6/4/2025 Tr. 120:21–22. But here, the Government did not present evidence beyond a reasonable doubt that Defendant knew the money would be spent, or wanted it to be spent, on ISIS activities, governmental, military, or otherwise.

Instead, the evidence the Government presented showed that Defendant sent Al-Anzi $400 after they discussed the extreme suffering of refugees and families in parts of Syria.[23] Specifically, the evidence showed Defendant wired the money to an individual named "Zaid," the apparent pseudonym for Al-Anzi, and although he was, in fact, an ISIS member, the Government failed to prove that Defendant knew that fact at the relevant time. Al-Anzi also testified that Defendant told him to give the money to poor people, and that Al-Anzi informed Defendant that he used the money for that purpose, purchasing food for families and medicine for another individual. Without more, this evidence does not prove beyond a reasonable doubt that Defendant had knowledge or intent to provide money to ISIS or to further ISIS's activities.

In sum, the evidence presented for Count Twelve failed to prove beyond a reasonable doubt that Defendant had the requisite mental state to provide material

---

[23] Likewise, the evidence and testimony showed Defendant wired the $400 to a location well outside ISIS controlled territory at the time of the transaction. Again, without more, supposedly providing humanitarian support to refugees, unconnected with any members of an FTO or an FTO's organizational functions, did not qualify as sufficient proof of material support under § 2339B, at least on these facts.

support for an FTO, as required under § 2339B. Therefore, an acquittal is the only appropriate result on this Count.

## IV. Conclusion

To summarize, the Court finds Defendant guilty beyond a reasonable doubt on Counts One through Eleven, and not guilty on Count Twelve, based on the findings of fact and conclusions of law set forth above.

Date: August 4, 2025

ENTERED:

John Robert Blakey
United States District Judge

75